47 So.2d 298 (1950)
LOFTIN et al.
v.
McCRAINIE.
Supreme Court of Florida, Division B.
June 27, 1950.
*299 Russell L. Frink and Page Haddock, Jacksonville, for Scott M. Loftin and John W. Martin as trustees of property of Florida East Coast Ry. Co.
McCarthy, Lane & Howell, Jacksonville, for Atlantic Coast Line R. Co.
Evan T. Evans and Neal D. Evans, Jr., Jacksonville, for appellee.
SEBRING, Justice.
The defendants have appealed from a judgment entered in favor of the plaintiff in a personal injury action wherein the defendants were charged with having negligently permitted a steer to escape from a cattle pen and injure the plaintiff.
The facts necessary to a proper understanding of the case are relatively simple:
In the early night of March 18, 1949 at the Company's stock pens in Jacksonville, Florida, certain employees of the Atlantic Coast Line Railway Company were engaged in unloading a shipment of wild scrub steers which were being transported by the Florida East Coast Railway Company from a point in south Florida. As the door of one of the cattle cars was opened by the employees, the steers "rushing and running in a wild struggle out of the car" forced their way down the unloading chute into the stock pen prepared for their reception, swept through this enclosure into an adjoining pen, and then stampeded through an unlatched gate into the surrounding territory.
Late that night seventeen of the cattle were found huddled together in a swampy section of the City some distance from the stock pens. There they were permitted to remain until the following morning. About eight or nine o'clock the morning after their escape ten or twelve of the employees were sent by a company representative to recapture the animals. All of these men were on foot or riding in automobiles, except one who was traveling on horseback. What happened with respect to the runaway cattle when these men arrived on the scene is vividly shown by the testimony of an employee in charge of operations:
"Q. What happened when you tried to pen them again the next morning? A. Well, it was just an impossibility.
"Q. What did they do? A. Well, they were wild, and evidently it was the first time that any of them had come in contact with any civilization at all, they just went crazy, and just scattered.
"Q. Were you all trying to run them down? A. We couldn't run them down. We attempted, if you know the location of *300 the Duval County prison farm, it is located right there in that same section, and we had permission from the superintendent or whoever is in charge out there, to put them in their pens, and we attempted to put them in there, but it was impossible because they would run right through the fence and jump the fences.
"Q. About what time of the morning on Saturday, the 19th, was that? A. Well, as you know, I was working at night and stayed up all night, and left along about twelve-thirty or one o'clock [Saturday afternoon], I had to go home and go to bed, and they were still attempting it when I left."
Another witness, a Coast Line policeman, gave the following version of the Company's attempt to pen the animals:
"Q. Do I correctly understand that you took part in the attempt to try to recapture the animals? A. That's right.
"Q. Let me ask you whether or not you were out in the neighborhood of the 100 block on McDuff Avenue on Saturday morning, we will say, between nine and ten o'clock? A. Yes sir.
"Q. And you were out there for what purpose? A. Well, Sergeant M.L. Fisher and I were trying to round up two steers that were headed in that direction. * * *
"Q. Did you see out there at that time and place a reddish brown or red and white steer? A. Yes sir.
"Q. Under what circumstances did you see this animal? A. Well, this reddish brown steer and a black one were coming or headed east on Beaver Street, and we attempted to turn them at the Beaver and McDuff intersection back towards the prison camp, the Duval County prison camp, and when they got to the intersection, why, the people began blowing their horns and hollering at them and everything, and they separated, and the reddish brown one went on down or went south on McDuff. * * *
"Q. I mean to ask how far it is from the intersection of McDuff and Beaver to the 100 block on McDuff? A. It is about two or three blocks. * * *
"Q. Who was blowing all of the horns at the steer? A. Well, the stoplight there at McDuff and Beaver had changed, and the cars were blocked both ways.
"Q. What effect did that blowing of horns have on the animal? A. It seemed to excite them, it separated them, we were trying to run them around, and they just got out of control and we couldn't do anything at all with them. * * *
"Q. How far had you pursued that animal? A. From the prison camp.
"Q. And how far from McDuff and Beaver was that? A. Well, I don't know, it is at least a mile or so, I imagine. I wasn't very familiar with that territory out there.
"Q. But you had been in pursuit of the animal for at least a mile? A. Yes sir.
"Q. And you hadn't been able to corral it or induce it to return * * * or offer any persuasion to it * * * to yield to your desires for it to come back? A. No sir, we couldn't do anything with it.
"Q. You could not control the animal? A. No, sir, not after we got on Beaver Street."
After the enraged and excited animal evaded the Coast Line representatives at the intersection of McDuff and Beaver, it ran wildly down McDuff Street "kicking and butting, butting with its head and kicking its heels * * * fighting at anything it came to." In the course of its journey it rammed a moving automobile, then charged at the plaintiff who was lawfully upon the street, and before she could escape inflicted the injuries which are the subject of this litigation. From there it continued south on McDuff Street until overtaken and killed by a member of the Jacksonville police force.
The defendants contend by various assignments that the negligent act of the Coast Line employees in leaving the gate of the stockpen unlatched was not the proximate cause of the injury to the plaintiff and hence that the plaintiff may not recover.
We cannot agree with this contention. Assuming, for the sake of argument, that a wild scrub steer can be classed as a *301 domesticated animal, it is the rule that "The owner or keeper of a domestic animal is bound to take notice of the general propensities of the class to which it belongs, and also of any particular propensities peculiar to the animal itself of which he has knowledge or is put on notice; and in so far as such propensities are of a nature likely to cause injury he must exercise reasonable care to guard against them and to prevent injuries which are reasonably to be anticipated from them." 3 C.J.S., Animals, § 145, p. 1247; 2 Am.Jur. pp. 728, 740, Animals, Secs. 48, 63.
The employees of the Coast Line who were at the Company's stockpens were certainly on notice of the "particular propensities peculiar to" the animals they were about to unload. They knew that they were wild scrub cattle. They knew that they had been jammed together in a cattle car without feed and water for a long period of time and hence were restless and excited. If any doubt could have existed as to their wild and unruly nature, it must have been dispelled by the actions of the animals just before and at the time the chute was placed at the car door and unloading was about to begin. This is shown by the testimony of the employee in charge of the unloading, who stated: "* * * the pen has a chute which is a built up platform that runs up level with the car on the door, and it has a gangplank which is lowered over into the car, two gates that closes the distance that separates the car from the chute and the car door is shoved back on the side of the car, and they have what you call a bull board which goes across the side of the car to prevent the cattle from coming out before you are ready for them. * * * They started out of the car all at one time, in other words, before I ever attempted to release that bull board they were coming out, and then is when I had to get out myself * * * one of them escaped under the bull board, and I was trying to make my escape out of the chute, when I was notified, and therefore I was occupied my ownself, and I wasn't paying any attention to the cows, where they was going."
The fact that the cattle continued in a rampageous mood once they were clear of the car was indicated by their actions in charging through the unlatched gate and stampeding into the surrounding territory.
Under these circumstances it seems to us that the Company was on notice that a high degree of vigilance would be required in order to save the general public from harm. Yet, in the face of these warning signals the Coast Line made no attempt to retake the animals which had stampeded into a swampy area within the City until late the following morning and at that time the attempt was made, not with men on horseback, as we would suppose to be normal procedure, but with only one lone rider, the rest of the men traveling on foot or by means of automobile. This doubtless well-intended but nevertheless apparently unorthodox technique of attempting to round up the wild and unruly cattle proved to be fruitless and, if we read the record correctly, served but to excite them further. For according to the man in charge of operations, the steers, at that point, "just went crazy and scattered." The record shows that after the steers had scattered, some of the employees chased two of them by automobile at least a mile along a public highway toward a busy section of the City. When they reached the intersection of Beaver and McDuff Streets the honking of horns excited the frantic animals still further and caused them to break away again. Then it was that one of the steers "kicking and butting, butting with its head and kicking its heels * * * fighting at anything it came to" attacked a moving automobile and then inflicted injuries on the plaintiff.
Under these facts we think that the jury was warranted in finding in favor of the plaintiff. When injury to a person who is himself without fault has resulted directly and in ordinary natural sequence from a negligent act without the intervention of any independent efficient cause, or is such as ordinarily and naturally should be regarded as a probable, not a mere possible, result of the negligent act, such person is entitled to recover damages as compensation for his loss. Compare Cone et *302 al. v. Inter County Telephone and Telegraph Co. et al., Fla., 40 So.2d 148. Had the runaway steers trampled down some innocent person as they broke from the stockpen, there could have been no real question of the negligence in leaving the gate unlatched being a proximate cause of the injury. There could have been little doubt of the question of proximate cause had the steers injured some one along the way as they stampeded from the stockpen into the surrounding territory. It is plain that in either case the negligence of the Company in leaving the gate unlatched would have been deemed the proximate cause of the resulting injury.
It has been suggested that because the plaintiff was injured the day after the steers effected their escape, at a point quite some distance from the pens, the original act of negligence in leaving the gate unlatched was too remote in time and place to support her action for damages based upon that specific charge of negligence. It has also been suggested that the activities of the Company's employees in attempting to retake the steers, or the honking of horns by motor vehicle operators at the corner of McDuff and Beaver while the employees were attempting to run them down was the direct cause of the plaintiff being injured, and became, in law, such an independent intervening efficient cause as to break the direct causal relationship between the original act of negligence charged and the ultimate injury to the plaintiff.
We see no merit in either suggestion. No intervening cause is efficient unless it is independent of and not set in motion by the original wrongful act. As stated in Woodcock's Adm'r v. Hallock, 98 Vt. 284, 127 A. 380, 383: "The mere fact that there has intervened a voluntary act of a responsible agent does not necessarily make the final consequence of the negligence too remote to support an action. The test is to be found in the character of the intervening act. If it is, itself, a natural and proper result of the original negligence, it will not necessarily prevent a recovery thereon." See also 38 Am.Jur. 726, Negligence, Sec. 69.
The intervening acts of the defendants after the stampede of the cattle from the stockpen were not "independent of" but were actually "set in motion" by the original wrongful act. The unsuccessful efforts of the employees to retake the animals were, in law, the "natural and proper result of the original negligence." The acts of the motor vehicle operators in honking their horns might have been deemed intervening independent efficient causes had the steers been under the complete dominion and control of their pursuers when they reached the intersection and had the sounding of the horns caused them to break away and inflict the damage to the plaintiff. But no such case is made by the record. The evidence shows that the negligence of the defendants continued up to and through the events that happened at the intersection; and though the activities of the people at the intersection may have played some part in causing the animals to continue on the rampage, the results of these activities may not be charged against the plaintiff who was absolutely faultless in the matter.
The judgment appealed from should be affirmed.
It is so ordered.
ADAMS, C.J., and CHAPMAN and HOBSON, JJ., concur.