Groner, Appellant, *v.* Hedrick.

Argued January 6, 1961. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

reargument refused April 20, 1961.

G. *Clinton Fogwell, Jr.*, with him *Jacques H. Fox*, and *Reilly and Fogwell*, and *Johnson, Fox, McGoldrick & Prescott*, for appellant.

*Lawrence E. MacElree*, with him *Richard Reif·snyder*, and *MacElree, Platt & Marrone*, for appellees.

OPINION BY MR. JUSTICE BOK, March 28, 1961:

First Friend, as Kipling called Wild Dog, was in this case a large Great Dane named "Sleepy". It jumped up on the plaintiff, who was seventy-four years old, five feet two in height, and 105 pounds in weight, and knocked her down so that she broke her arm and leg. The jury gave her $17,000 but the court

below entered judgment for defendants n.o.v., on the theory that plaintiff had assumed the risk of Sleepy's temperament. A motion for a new trial was also filed but not disposed of.

What happened was that defendants hired plaintiff to come and be housekeeper and companion for Mrs. Stanley, Mrs. Hedrick's mother, while Mrs. Hedrick went to Europe. Mr. Hedrick stayed behind. The term of employment was five weeks at $100 or $125, and the accident happened after she had been on the job four weeks. She carried a little whip "because he acted as if he was inclined to jump. I was afraid he would jump and knock me over." She also took hold of things when the dog was near, to steady herself, and once, when she told Mr. Hedrick that she was afraid Sleepy would jump on her, he replied: "Be careful; he might." He jumped or brushed against her on several occasions. She said: "I don't think he was vicious. I'm not sure", and that nothing but his jumping indicated that he was trying to hurt her. He did not growl. Another witness, who said that the dog had jumped on her twice, called him "friendly".

On the day of the accident, plaintiff and her patient were preparing to sit down to lunch when Mrs. Stanley asked her to let Sleepy in, in order to keep him off the highway. She called him from the porch, and "when he got beside me. I started to go inside the house with him, through the living room door, and that is when he just turned suddenly and just jumped on me . . . he just went past me, then he suddenly turned and jumped." By jumping she meant that the dog "raised up with his front paws against here . . . left shoulder, left chest." He often put his paws up when plaintiff sat on the sofa, and she kept a rolled magazine to keep him away.

We have no doubt that enough appears to establish defendant's negligence, and indeed this point has not

been argued. A large, strong, and over-friendly dog may be as dangerous as a vicious one, and our recital of the dog's behavior at home is enough to bring knowledge to his owners, when considered together with its size and their apparent knowledge that it might jump up on people: *Andrews v. Smith,* 324 Pa. 455 (1936), 188 A. 146. In *Fink v. Miller,* 330 Pa. 193 (1938), 198 A. 666, the opinion refers to the dog's viciousness or playfulness as undisclosed by the evidence. We can find no Pennsylvania case of harm by *mansuetae natura,* or tame and domesticated animals, resulting from their excessive affection. Since intention forms no part of an animal's assault and battery, the mood in which it inflicts harm is immaterial, so far as the owner's duty goes. An Alabama case argues what seems to us the correct rule: *Owen v. Hampson,* 258 Ala. 228, 62 So. 2d 245, 248 (1952), in which the court said: "Based on a review of our cases, as well as those from other jurisdictions, it is our opinion that the law makes no distinction between an animal dangerous from viciousness and one merely mischievous or dangerous from playfulness, but puts on the owner of both the duty of restraint when he knows of the animal's propensities. Crowley v. Groonell, 73 Vt. 45, 50 A. 546, 55 L.R.A. 876; State v. McDermott, 49 N.J.L. 163, 6 A. 653; Knowles v. Mulder, 74 Mich. 202, 41 N.W. 896; Hicks v. Sullivan, 122 Cal. App. 635, 10 P. 2d 516; Mercer v. Marston, 3 La. App. 97; Hartman v. Aschaffenburg, La. App., 12 So. 2d 282.

"In 3 C.J.S. §148, c, p. 1250, under the title Animals, the rule is stated thus: 'A vicious propensity is a propensity or tendency of an animal to do any act that might endanger the safety of the persons and property of others in a given situation. Although an animal is actuated solely by mischievousness or playfulness, rather than maliciousness or ferociousness,

yet if it has a tendency to do a dangerous or harmful act, it has a vicious propensity within the meaning of the rule holding the owner or keeper liable for injuries resulting from vicious propensities of which he has knowledge.'" See Restatement, Torts, §518(1), and *Stevenson v. U. S. Express Co.*, 221 Pa. 59 (1908), 70 A. 275, where the temperament of a horse was held to be a matter for the jury.

We regard the rule as different so far as the victim's reaction to the animal is concerned. People trust a dog sooner than a tiger, and they would trust a friendly dog before a vicious one. In life the firmest friend, Byron said of the dog: the first to welcome, foremost to defend. It is likely that plaintiff would have acted very differently if Sleepy had been a growler and a biter. A bite is a bite, but a dog's display of affection may be greater or less. And plaintiff had successfully evaded the animal's amiable lunges for four weeks.

Hence, when we give her the benefit of all favorable facts and inferences, as we are told to do while considering judgment n.o.v. by such cases as *Rutovitsky v. Magliocco*, 394 Pa. 387 (1959), 147 A. 2d 153, we think that the entry of summary judgment was error. In *Esher v. Mineral R. R. & Mining Co. (No. 1)*, 28 Pa. Superior Ct. 387 (1905), the Court said: "Where the facts are disputed, where there is any reasonable doubt as to the inference to be drawn from them, or when the measure of duty is ordinary and reasonable care and the degree varies according to the circumstances, the question cannot in the nature of the case be considered by the court; it must be submitted to the jury."

The Superior Court then added: "It cannot be successfully contended that the risk of injury from the vicious mule was so obvious that Esher ought not to have continued in the service of the company in the

tunnel where the mule was used or that if he did so he assumed the risk of injury. If he knew the vicious disposition of the mule, it was still the province of the jury to determine whether from the character of his duties he assumed the risk of injury from this source."

The court below quotes Section 521 of the Restatement (2d), Agency: "In the absence of a statute or an agreement to the contrary, a master is not liable to a servant for harm caused by the unsafe state of the premises or other conditions of the employment, if the servant, with knowledge of the facts and understanding of the risks, voluntarily enters or continues in the employment."

We think that it was for the jury to say whether plaintiff, under the economic pressure of the job, had knowledge of the facts and understanding of the risks, when the facts and the risks were dependent upon Sleepy's mood, and hence whether she can be held to have assumed them. There are too many variable factors in the dog and in the person and in the enclosing circumstances. Even this court has taken an advanced position of trust about dogs, when we said, in *Andrews v. Smith,* supra (324 Pa. 455): "Of all animals, dogs have probably been the longest domesticated and the vast majority of them can be allowed their freedom without imperiling the public safety."

The judgment is reversed and the record is remanded with directions to dispose of the motion for a new trial.

———

DISSENTING OPINION BY MR. JUSTICE BELL:

The majority and I agree that a dog is man's best friend; after that we part. It is likely that dogs were originally tamed and used for protection, later for the chase, then for "beasts of burden", and now princi-

pally for companionship and affection. A dog exhibits obedience but not affection by lying in the corner. Those who understand or love dogs know that very often they show their affection by putting their paws on or licking or playfully jumping onto persons they like or love. I cannot understand how a Court can equate a dog's act of affection with viciousness. It will come as a bitter blow to all dog lovers, and their numbers are legion, to learn that man's best friend is malum in se and that the only dog they can safely keep, even in their own home, is a sleeping dog or a dead dog.

Assuming, arguendo, that this dog's affectionate actions amounted to legal misconduct, plaintiff admittedly knew well the dog's dangerous propensities and clearly and certainly assumed the risk.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

I fail to see the relevancy of debating whether the injury was caused by Sleepy's affectionate or vicious action. I also fail to see how the majority can imply that "the economic pressure of the job" negated the plaintiff's "knowledge of the facts and understanding of the risks" incident to her employment. This case falls within the clear and precise language of Section 521 of the Restatement (2d), Agency (1958). See also *Jerdon v. Sirulnik,* 400 Pa. 423, 162 A. 2d 202 (1960). Since the defendants have violated no duty that they owed to the plaintiff I would affirm the judgment of the court below.