RUTH FARRIOR .and JEAN LAUBENFELS, Plaintiffs-
Appellants, *v.* GLEN I. PAYTON, JR., BETTY JUNE
PAYTON and KIM PAYTON, Defendants-Appellees

NO. 5828

MARCH 30, 1977

RICHARDSON, C.J., KOBAYASHI, OGATA,
MENOR and KIDWELL, JJ.

OPINION OF THE COURT BY KOBAYASHI, J.

This case is the result of a suit initiated by Ruth Farrior (Mrs. Farrior) and Jean Laubenfels (Miss Laubenfels) (hereinafter collectively called appellants) against Glen I. Payton, Jr. (Mr. Payton), Betty June Payton (Mrs. Payton), wife of Glen Payton, and Kim Payton (Kim), son of Mr. and Mrs. Payton, (hereinafter collectively called the Payton family or appellees) for personal injuries sustained when, in an attempt to avoid what was believed to be an imminent attack by a German shepherd dog, they fell off a natural rock wall onto

rocks some ten feet below. At the close of the evidence, appellee's motion for directed verdict was granted. It is from this judgment that appellants appeal.

For reasons stated below, we reverse and remand this case for proceedings not inconsistent with this opinion.

### ISSUES

(1) Whether the trial court erred in granting appellees' motion for directed verdict.

(2) Whether the trial court erred in refusing to admit appellants' exhibits 9 and 10.

### STATEMENT OF THE CASE

This case arises out of an incident which occurred on February 21, 1972, on or near the Payton family residential property. The appellees' property is uniquely situated on an elevated beach front between the Lanikai beach area and the Bellows Air Force Base beach area, Kailua, Oahu, Hawaii. It is bordered on the mauka[1] side by a steep hill. Access from the beach is inhibited by a ten-foot high man-made seawall which extends along the shoreline from the Lanikai side of the beach to a point near the Bellows side where it connects with a natural rock wall that extends upward approximately ten feet high from the water to a sandy area fronting the Payton property.

On the Bellows side of the Payton property is a six to eight-foot high man-made rock wall which runs mauka from the water's edge. This man-made rock wall separates the Bellows beach area from the Lanikai beach area and also blocks access to the Payton property and the sandy area fronting it. A gate is inset in the mauka end of the rock wall

---

[1] Inland, upland, towards the mountain.

with an "Off Limits" sign[2] posted on it. Adjacent to the Payton property on the Bellows side of the rock wall is the General's Quarters. Between the General's Quarters and the Payton property is a picturesque, rocky peninsula which juts out into the ocean.

On the day of the incident, the Payton family owned a dachshund which was kept in their house and a 3-4 year old German shepherd dog which was given the general run of the Payton property. Aside from the above rock wall and seawall, the makai[3] portion of the property had no fencing. However, there was testimony that the remaining portion of the property was fenced.

The German shepherd dog attended obedience training school and was trained by Mr. Payton and Kim to respond to various commands. There was testimony to the effect that Kim had a relationship with the German shepherd dog so that the dog would respond to Kim's verbal command to stay or stop.

The Payton family knew that the German shepherd dog "patrolled" their property and would run and bark at strangers. The Payton family claims, however, that the dog would stop short of any intruder and continue barking. One of the reasons the Payton family kept the dog was to deal with the occasional "problem of trespassers".[4] However, there was

---

[2] Mrs. Farrior testified that she knew of the existence of the "Off Limits" sign but was of the understanding that it had outlasted its purpose since it "was put there when Linda Robb Johnson [sic] was there." On the day of the incident, however, she was "not thinking of any signs."

[3] On the seaside, toward the sea, in the direction of the sea.

[4] The Payton property is situated in such a location that in order to get from the Bellows beach area to the Lanikai beach area and vice versa one must either (1) swim around the point; (2) walk on the water's edge along the base of the man-made seawall and the natural rock wall if the tide permits; (3) drive approximately five miles to the other side; or (4) walk along the top of the man-made seawall and natural rock wall fronting the Payton property. It is those persons utilizing the top of the seawall and the rock wall as a short-cut whom the Payton family considers "trespassers".

no evidence that the German shepherd dog had ever bitten anyone.

On February 21, 1972, Mrs. Farrior and her husband, their son Owen, Miss Laubenfels and three other friends went picnicking at Bellows Beach. Mrs. Farrior, Owen, and Miss Laubenfels subsequently went for a walk along the beach in the Lanikai direction. With Mrs. Farrior leading, the trio walked around in the rocky peninsula between the General's Quarters and the Payton property. Mrs. Farrior was somewhat familiar with the area as she had explored this area eight years earlier. Although she could not recall the exact path to take, it was Mrs. Farrior's intention to lead the group to the Lanikai beach area.

The trio then proceeded downward off the rocky peninsula onto a beach area at the base of the natural rock wall and the man-made rock wall. The tide, however, began to flow, thereby making access to the Lanikai beach area via the water's edge extremely difficult. Mrs. Farrior decided to lead Owen and Miss Laubenfels up the natural rock wall. The natural rock wall was fairly steep, requiring care in negotiating the climb. Mrs. Farrior, followed by Miss Laubenfels and Owen, made her way over the natural rock wall and around the man-made rock wall. She advanced ten to twelve feet towards the Payton residence and was admiring the improvements made in the garden since she had been there last. Although Mrs. Farrior knew the Payton residence was there, she had "no thought about whether it was private property or anything else."

As she was advancing and admiring the improvements, Mrs. Farrior saw and heard a German sheperd dog barking approximately fifty yards away by the Payton house lanai. She, however, disregarded the barking because she saw a young man standing with the German shepherd dog. The dog continued to bark for approximately ten minutes during which time Mrs. Farrior continued to admire the garden and tried to get her bearings.

Mrs. Farrior first noticed the dog barking and running towards her in an attack position[5] when it was half way between the house and her position. There was no evidence of any intentional provocation or aggravation towards the dog on the part of the appellants. After realizing that a command to stop from its master was not forthcoming, she turned and called out a warning to Miss Laubenfels who had just arrived at the top of the rock formation. Miss Laubenfels also heard the dog barking and saw a young man standing some distance in front of Mrs. Farrior. Miss Laubenfels had neither seen the German shepherd dog up to this point nor was she alarmed by its barking until Mrs. Farrior called out a warning to her.

Both women rushed back towards the direction from which they came. Mrs. Farrior glanced back and saw the German shepherd dog about ten to fifteen feet away. In their attempt to descend the natural rock wall and to get around the man-made rock wall, Mrs. Farrior and Miss Laubenfels reached "the same place at the same time." Unable to hold their footing, they slipped and fell approximately ten feet onto a rocky area directly below. Owen, who had not yet reached the flat sand and rock area, observed the incident and descended onto the rocks below to render assistance.

By this time the German shepherd dog had reached the rock's edge and was hovering over the appellants, barking and growling in a threatening manner. Kim soon appeared behind the dog and began to berate the appellants yelling "Trespassers, serves you right!" Mrs. Farrior pleaded for assistance but Kim refused and continued to berate the injured appellants.

Owen and a stranger who was nearby subsequently assisted Mrs. Farrior and Miss Laubenfels back to the picnic area. The appellants were then taken to hospitals for medical treatment. Mrs. Farrior fractured her left foot and sustained a

---

[5] Mrs. Farrior and her father had previously raised and trained dogs in Australia. She was familiar with dogs and recognized that the crouching and threatening manner in which the dog was running was indicative of an attacking dog.

massive soft tissue injury to her left lateral hip and thigh area. Miss Laubenfels suffered a compression fracture of her vertebra as a result of the incident.

Mr. and Mrs. Payton first learned of the incident after the complaint was filed by the appellants on January 9, 1973.

OPINION

DID THE TRIAL COURT ERR IN GRANTING APPELLEE'S
MOTION FOR DIRECTED VERDICT?

The proper standard to be applied in determining the appropriateness and validity of a directed verdict was stated in *State Savings & Loan v. Corey*, 53 Haw. 132, 488 P.2d 703 (1971). Quoting from *Young v. Price*, 47 Haw. 309, 313, 388 P.2d 203, 206 (1963); rehearing, 48 Haw. 22, 24, 395 P.2d 365, 367 (1964), this court held that:

> " '[O]n motions for a directed verdict, the evidence and the inferences which may be fairly drawn from the evidence must be considered in the light most favorable to the party against whom the motion is directed and if the evidence and inferences viewed in that manner are of such character that reasonable persons in the exercise of fair and impartial judgment may reach different conclusions upon the crucial issue, then the motion should be denied and the issue should be submitted to the jury.' " [*Id*. at 145, 488 P.2d at 711.]

However, it should be noted that facts essential to the question of submissibility may not be inferred in the absence of a substantial evidentiary basis. *Frazier v. Stone*, 515 S.W.2d 766, 767 (Mo. App. 1974). And " 'where there is no conflict from the evidence and but one inference can be drawn from the facts, it is the duty of the court to pass upon the question of negligence and proximate cause as questions of law.' " *Tsugawa v. Reinartz*, 56 Haw. 67, 71, 527 P.2d 1278, 1283

(1974), quoting from *Young v. Price, supra,* 47 Haw. at 313, 388 P.2d at 206.

In considering whether the evidence is conflicting and the inferences therefrom, the basis of liability for an owner of a dog that has caused or inflicted injuries must first be determined. The court in *State ex rel. Kroger Company v. Craig,* 329 S.W.2d 804, 808-809 (Mo. App. 1959) stated the general rule:

> "[I]n an action against the owner or harborer of a dog for injury inflicted by such animal, defendant's scienter (i.e., actual or constructive knowledge) of the vicious or dangerous propensities of the dog . . . is (except where removed by statute) an essential element of the cause of action and a necessary prerequisite to recovery. . . .' " [Citation omitted]

Therefore, in order for the appellants to prove scienter, it is necessary that the evidence show that Tiger, the German shepherd dog in the present case, had in fact vicious or dangerous propensities. *State ex rel. Kroger Company v. Craig, supra.* "Of course, the injury complained of must result from the exercise of the dangerous propensity." *Maxwell v. Fraze,* 344 S.W.2d 262, 264 (Mo. App. 1961).

The terms "vicious propensities" and "dangerous propensities" have been defined as "[a]ny propensity on the part of the dog, which is likely to cause injury under the circumstances in which the person controlling the dog places it . . . and a vicious propensity does not mean only the type of malignancy exhibited by a biting dog, that is, a propensity to attack human beings." 3A C.J.S. *Animals* § 199, at page 701 (1973); *Dansker v. Gelb,* 352 S.W.2d 12, 16-17 (Mo. Sup. 1961). It " 'includes as well a natural fierceness or disposition to mischief as might occasionally lead him to attack human beings without provocation.' " (Citation omitted.) *Frazier v. Stone, supra* at 768.

We now proceed to apply the above standards and examine the evidence and inferences therefrom to determine if, when taken in the light most favorable to the appellants, it is

of such character that reasonable persons may draw different conclusions upon the crucial issue of appellees' negligence, that is, whether the appellees kept a vicious or dangerous dog with knowledge of the dog's vicious or dangerous propensities, and whether the injury complained of was the result of any such propensity.

In granting the appellees' motion for a directed verdict, the trial court in its findings stated:

> There is evidence that the defendants allowed the dog to roam free and the dog would run and bark at people. There is no evidence that the dog was considered vicious. The running and barking of the dog at strangers on defendants' own property cannot be said of such dangerous propensity to find the defendants negligent.
>
> There is no evidence that the defendant, Kim Payton had intentionally urged the dog to chase the plaintiffs. There is testimony that Kim Payton may have stopped the dog by ordering the dog to stop; however, there is no evidence that he had failed to try to do so. There is no evidence of biting or any contact of the dog with the plaintiffs. At the most, the dog was about fifteen feet from the plaintiffs at the nearest point.
>
> The evidence is clear that the injury was caused or injuries were caused by the negligence of the plaintiffs and not the defendants. The injury to Miss Laubenfels was due to the negligence of the plaintiff, Mrs. Ruth Farrior.

It is true that there was sufficient evidence from which the jury could have properly found that the German shepherd dog was subject to Kim's oral commands. There was also evidence placing Kim and the German shepherd dog together near the Payton residence patio when Mrs. Farrior reached the flat sand and rock area fronting the Payton property. The German shepherd dog barked continuously for approximately ten (10) minutes before running towards Mrs. Farrior, thus certainly calling Kim's attention to it. The circumstances permit an inference that Kim saw the German shepherd dog

start for Mrs. Farrior and that he then had an opportunity to stop it by an oral command. The fact that Mrs. Farrior did not hear a command and the fact that the German shepherd dog did not stop running towards her permit an inference that no command was given. Furthermore, Kim's statement to the injured appellants, "Trespassers, serves you right!", permits, at the least, an inference that he saw Mrs. Farrior on the property before the accident. If this were true, he owed her a duty of care to control the dog to prevent harm to her notwithstanding the fact that she may have been a trespasser. The rule is stated in Restatement, Second, Torts § 338 (1965):

> A possessor of land who is in immediate control of a force, and knows or has reason to know of the presence of trespassers in dangerous proximity to it, is subject to liability for physical harm thereby caused to them by his failure to exercise reasonable care.
>
> (a) so to control the force as to prevent it from doing harm to them, or
>
> (b) to give a warning which is reasonably adequate to enable them to protect themselves.

In *Pickard v. City & County*, 51 Haw. 134, 135, 452 P.2d 445, 446 (1969), we stated:

> We believe that the common law distinctions between classes of persons have no logical relationship to the exercise of reasonable care for the safety of others. We therefore hold that an occupier of land has a duty to use reasonable care for the safety of *all persons reasonably anticipated to be* upon the premises, regardless of the legal status of the individual. (Emphasis added.)

In our statement of the case we have stated that "one of the reasons the Payton family kept the dog was to deal with the occasional 'problem of trespassers' ". In addition, Kim's knowledge of the dog's propensities gave him notice that someone was close enough to motivate the dog to bark and run. He owed a duty to control the German shepherd dog to prevent harm to that person, and it does not matter whether

he had then actually seen Mrs. Farrior. In our judgment, Kim's statement to the appellants after their fall and his knowledge of the dog's propensities, coupled with the fact that he refused to aid the injured appellants and the fact that his parents first learned of the incident after the complaint was filed nearly 11 months later, raise a strong inference of willful or wanton misconduct on Kim's part.

The evidence in the record also establishes the fact that the Payton family not only knew of their dog's propensity to run and bark at strangers utilizing the "short-cut" via the man-made seawall and the natural rock wall but also expected such activity from their German shepherd dog.

Although it has been held that "[b]arking, runing loose, jumping, and lunging are activities in which all dogs engage and, absent further showing, do not alone justify a finding of vicious propensities," *Frazier v. Stone, supra* at page 769, it is our belief that the circumstances of this case necessitate otherwise.

The rule is well-settled that:

> [T]he owner or keeper of a domestic animal is bound to take notice of the general propensities of the class to which it belongs, and also of any particular propensities peculiar to the animal itself of which he has knowledge or is put on notice; and insofar as such propensities are of a nature likely to cause injury he must exercise reasonable care to guard against them and to prevent injuries which are reasonably to be anticipated from them. In this respect, a vicious or dangerous disposition or propensity may consist of mere mischievousness or playfulness of the animal, which, because of its size or nature, might lead to injury, for it is the act of the animal, rather than its state of mind, which charges the owner or keeper with liability.

4 Am. Jur. 2d *Animals* § 86, p. 332 (1962). *Accord,* 3A C.J.S. *Animals,* § 177, pp. 668-669 (1973); *see Mungo v. Bennett,* 238 S.C. 79, 119 S.E.2d 522 (1961); *Groner v. Hedrick,* 403 Pa. 148, 169 A.2d 302 (1961); *Pennyan v. Alexander,* 229 Miss.

704, 91 So.2d 728 (1957); *Loftin v. McCrainie*, 47 So.2d 298 (Fla. 1950).

The Paytons testified that their German shepherd dog would stop short of strangers but would continue barking. This fact, however, would not be known to those encountering the dog.[6] "It has been said that with respect to such dogs [German shepherd dogs], '[i]t is a matter of common knowlledge that the court can almost take judicial knowledge of the fact that police dogs are, by nature, vicious, inheriting the wild and untamed characteristics of their wolf ancestors.' " [Citation omitted] *Ford v. Steindon*, 232 N.Y.S.2d 473, 474 (1962).

In *Machacado v. City of New York*, 365 N.Y.S.2d 974 (1975), an action was brought by a woman who sustained injuries when, in an attempt to avoid what was believed to be an imminent attack by a ferocious animal, she slipped on a snow covered sidewalk after the defendant's German shepherd dog emerged from behind a brick wall on the defendant's property and hurled itself against a cyclone fence separating the sidewalk and the property. In denying a motion to dismiss the complaint, the New York Supreme Court, Queens County, held:

It is for a jury to determine whether the owner had the duty to do other than erect the fence knowing that it bordered upon a sidewalk used by the public and that his dog had the propensity to charge at and frighten passing pedestrians.

Similarly, the issues of proximate cause and foreseeability are questions of fact. One cannot avoid liability solely by the creation of a cyclone fence. Danger and physical harm are not of necessity screened out by the presence of a barrier if that barrier is in some way surmountable or permits the threat of danger. The right to

---

[6] It should be noted that Mrs. Farrior had prior experience in raising and training dogs and believed that the German shepherd dog was charging in an attack position. See fn. 5.

harbor animals must yield to the duty of containing them in a reasonable manner so as to avoid the harm that can befall an unsuspecting person, lack of physical contact notwithstanding. Owning and keeping a German shepherd dog in an urban area requires the highest standards to be employed in the protection of the innocent public.

The exercise of reasonable care transcends the fence itself thereby requiring a jury's examination of all of the circumstances leading up to the injury.

Whether an owner owes no further duty than to erect a fence under the circumstances of this case and without other reasonable safeguards or restraints is a question to be answered by community standards through a jury's verdict. [*Id.* at 979-980]

The harm which appellants suffered was a consequence of serious mental distress caused by the actions of the Payton's dog. We have held that there is an obligation to refrain from the negligent infliction of serious mental distress, which duty is owed to those who are foreseeably endangered by a defendant's conduct and is owed with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous. *Rodrigues v. State*, 52 Haw. 156, 174, 472 P.2d 509, 521 (1970).

It would be predictable that Mrs. Farrior would become frightened and would retreat to a precarious position. In this respect, it was stated in *Machacado v. City of New York*, *supra* at 976, that:

Experience and common sense dictate that a person, believing herself to be in imminent danger of attack by a feral animal, will take immediate and precipitous action to avoid injury. As such, if the footing, as in this case, is treacherous or uncertain, it increases the probability that injury will result either from the attacking animal or from the frightened actions of its intended prey.

If Mrs. Farrior were negligent in her attempt to escape the charging German sheperd dog, it was for the jury to assess the

comparative negligence under the circumstances. HRS § 663-31 (Supp. 1975).

Having examined the evidence in the record, it is our judgment that, under the circumstances of this case, there was sufficient evidence and inferences therefrom for reasonable persons in the exercise of fair and impartial judgment to reach different conclusions as to the crucial issue. It is also our judgment that there was sufficient evidence from which the jury could have found that the appellees knew or should have known that their dog was of a vicious or dangerous disposition or propensity within the rules and authorities cited above.

The nature and extent of the Paytons' duty as landowners, as distinct from Kim's duty as the person in charge of the dog, to persons who might intrude upon the makai portion of their property under the circumstances of this case, was not briefed or argued and we will not anticipate the question. *See* Restatement of Torts, § 512 (1938); Restatement, Second, Torts § 335 (1965); Restatement, Second, Torts § 512 (Tentative Draft No. 10, 1964).

Although the issue was not raised by the parties, we felt it necessary to comment on the effect of Kim's age in respect to the liability of his parents. The record fails to establish whether Kim was a minor or had reached the age of majority at the time of the incident. If Kim were a minor, the liability of Mr. and Mrs. Payton may be established pursuant to HRS §. 577-3 (Supp. 1975).[7] Even if Kim had reached the age of majority,[8] Mr. and Mrs. Payton may be held liable as joint owners of the German shepherd dog. Appellees, in their answer to the amended complaint, admit that they "owned,

---

[7] HRS § 577-3 (Supp. 1975), *inter alia*, states:

. . . The father and mother of unmarried minor children shall jointly and severally be liable in damages for tortious acts committed by their children, and shall be jointly and severally entitled to prosecute and defend all actions in which the children or their individual property may be concerned.

[8] HRS § 577-1 established the age of majority to be twenty years until it was amended on March 28, 1972, by Act 2, § 1, S.L.H. 1972, to be eighteen years.

kept and harbored" the German shepherd dog. The fact that Mr. and Mrs. Payton were not at home at the time of the incident would not necessarily absolve them of liability for their negligence in improperly maintaining a vicious or dangerous dog with knowledge of the dog's vicious or dangerous propensities. *See Harris v. Fisher*, 115 N.C. 318, 20 S.E. 461 (1894); *State ex rel. Kroger Co. v. Craig, supra*. It was at their instance or with their approval that the dog was given the general run of the property, the makai portion of which was unfenced. It was in this area that the critical events leading to the appellants' injuries occurred.

At common law, joint owners of an animal may be liable in an action for injuries caused by such animal. *Oakes v. Spaulding*, 40 Vt. 347, 94 A.D. 404 (1867). In addition, it is stated that:

> Where joint ownership in a vicious animal exists, one joint owner ordinarily owes to third persons the same degree of care to protect them from its attacks as does the other, unless the peculiar circumstances of the given case should relieve one or the other from that duty. . . .

4 Am. Jur. 2d *Animals*, § 91, p. 338 (1962). *See Oakes v. Spaulding, supra; Swain v. Tillett*, 269 N.C. 46, 152 S.E.2d 297 (1967). Thus, it is clear that Mr. and Mrs. Payton, along with their son, Kim, are proper defendants in the present case. HRS § 663-1 (Supp. 1975).

Appellants also contend that a violation of a municipal ordinance[9] is evidence of negligence as a matter of law and that the trial court erred in finding otherwise. We find appellants' contentions without merit. Although this may be true under certain circumstances,[10] such ordinances were

---

[9] The ordinances relied upon by the appellants are found in *Revised Ordinances of Honolulu*, Article 31 (Regulation of Dogs), §§ 13-31.1, 13-31.2 (1969).

[10] *See* Young v. Honolulu Constr. and Draying Co. Ltd., 34 Haw. 426 (1938) and Sayers v. Haushalter, 493 S.W.2d 406 (Mo. App. 1974).

not in evidence nor were they called to the attention of the trial court for judicial notice. *See e.g. Cooper v. Sawyer*, 48 Haw. 394, 405 P.2d 394 (1965). HRS § 622-13 (Supp. 1975)[11] is specific upon the proof of the existence of an ordinance and its terms. "When a statute provides the method of proof of an ordinance to make it admissible as evidence, that method must be strictly followed." *Territory v. Yoshikawa*, 41 Haw. 45, 47 (1955); *State v. Shak*, 51 Haw. 626, 466 P.2d 420 (1970).

The trial court did not err, for in the absence of proof of the existence of and the terms of the ordinances alleged to have been violated, it could not have properly taken judicial notice of them. We cannot now take cognizance of them.

---

[11] HRS § 622-13 (Supp. 1975) reads:

§622-13 *Proof of ordinances, rules, regulations, and other official acts.* (a) Whenever, in any proceedings before a court or person having authority to hear, receive and examine evidence, it is necessary to prove any ordinance of any county of the State, or any law, rule, regulation, or other official act or thing promulgated or enacted by or under authority of the Constitution and laws of the United States or the State, a copy of such ordinance, bearing the certificate, as to its correctness, of the county clerk and under the seal of the county, or a copy of the law, rule, regulation, or other official act or thing, printed by authority, or bearing the certificate, as to its correctness, of the official in whose custody the original is kept, shall be admitted in evidence as prima facie proof of the contents thereof.

(b) A certified copy or copies of an ordinance or ordinances of any county may be filed by the clerk of the county with any court and thereafter the court may take judicial notice of the ordinance or ordinances and the contents thereof in any cause, without requiring a certified copy or copies to be filed or introduced as exhibits in such cause.

(c) Judicial notice shall be taken of an ordinance or ordinances of any county if a party requests it and (1) furnishes the court sufficient information to enable it properly to comply with the request, and (2) has given each adverse party such notice as the court may require to enable the adverse party to meet the request. The court shall afford the adverse party reasonable opportunity to present information relevant to the tenor of the ordinance to be noticed. If the court has insufficient information to enable it to notice the matter judicially, it shall decline to take judicial notice thereof.

### DID THE TRIAL COURT ERR IN REFUSING TO
### ADMIT APPELLANTS' EXHIBITS 9 AND 10?

Relying on the holdings in *In re Application of Ashford*, 50 Haw. 314, 440 P.2d 76 (1968), and *County of Hawaii v. Sotomura*, 55 Haw. 176, 517 P.2d 57 (1973), the appellants attempted to establish the fact that the area in which the incident occurred was State or public property. Those cases established "a judicial recognition of long-standing public use of Hawaii's beaches to an easily recognizable boundary that has ripened into a customary right. (Citation omitted.) Public policy . . . favors extending to public use and ownership as much of Hawaii's shoreline as is reasonably possible." *County of Hawaii v. Sotomura, supra*, at 181-182, 517 P.2d at 61-62. In determining the boundary of seaside property, the court in *In re Application of Ashford, supra*, held that the seaward boundary is "along the upper reaches of the wash of the waves. . . ." *Id.* at 315, 440 P.2d at 77.

Appellants attempted to show that the boundary between the State-owned beach or shore area and the Paytons' residence property was mauka of the seawall and natural rock wall, so that no entry was made by the appellants on property owned by the Paytons during the incident herein described. No competent evidence of the location of this boundary was offered. The seawall and natural rock wall were regarded by the Paytons as boundaries of their property. The occasions of persons scaling these walls and coming onto the flat area above had been sufficiently frequent that such interference with their privacy had become annoying to the Paytons. The only notice to any person approaching along the beach from the Bellows side that the area above the walls was regarded by the Paytons as wholly within their residence property was provided by the fact that the man-made rock wall ran down to the natural rock wall and the existence of the "Off Limits" sign above referred to.

In support of their proposition, appellants attempted to introduce exhibits 9 and 10, which were certified copies of a

State Survey Division Shoreline Map and a Land Court Map, respectively, purporting to show the boundary lines of the Payton property.

The record is devoid of evidence establishing the exact location or lot number of the Payton property in relation to the lots found in the Land Court Map. The map itself is of no help in locating the Payton property. Furthermore, the exact location of the incident cannot be reasonably calculated on the Land Court Map nor is it even a part of the State Survey Division Shoreline Map. No foundational witnesses were called to establish the accuracy and correctness of the boundary lines in question. See A.L.R.2d 1081, 3 *Jones on Evidence* (6th ed.) § 15.10 (1972). There was also no competent evidence[12] establishing the vegetation line.

As we view the maps, we find them rather confusing at best.

Notwithstanding the fact that the maps were certified and notwithstanding HRS §§ 622-15, 622-22 and 622-23 (Supp. 1975),[13] the trial court properly excluded appellants' exhibits

---

[12] Although Mrs. Farrior testified that she was in a sand and rock area when the incident occurred and the photographs in evidence show the general makeup of the area, we cannot, without more, determine the vegetation line referred to in the *Ashford* and *Sotomura* cases.

[13] HRS §§ 622-15, 622-22 and 622-23 (Supp. 1975) read as follows:

§622-15 *Documents of public nature, generally.* Whenever any book or other document is of such a public nature as to be admissible in evidence on its mere production from the proper custody, and no law exists which renders its contents provable by means of a copy, any copy thereof or extract therefrom shall be admissible in any court, or before any person having authority to hear, receive, and examine evidence; provided it be proved to be an examined copy or extract, or provided it purport to be signed and certified as true copy or extract by the officer to whose custody the original is intrusted.

§622-22 *Official documents, corporate records, proof by seal or stamp.* Whenever by law any certificate, official or public document, or proceeding of

9 and 10 for lack of a proper foundation, and in particular, for lack of relevancy.

We reverse and remand this case for further proceedings not inconsistent with this opinion.

*Joseph M. Gedan* for plaintiffs-appellants.

*Stephen H. Brandt (Kenneth S. Robbins* with him on the brief) for defendants-appellees.

---

any corporation, or joint stock, or other company, or any certified copy of any document, or bylaws, entry in any register or other book, or of any other proceeding is receivable in evidence of any particulars, the same shall be admitted in evidence in any court, and by any person having authority to hear, receive, and examine evidence, provided the same purports to be sealed, or impressed with a stamp, or sealed and signed as directed by law, without any proof of the seal or stamp where a seal or stamp is necessary, or of the signature or of the official character of the person appearing to have signed the same, and without any further proof thereof in every case in which the original record or document could have been received in evidence.

§622-23 *Official signatures judicially noticed.* All courts and all persons having authority to hear, receive, and examine evidence, shall take judicial notice of the signature of every person who is or was, head of any executive department, cabinet minister, judge of the supreme court, or of any circuit court, or clerk or deputy clerk of the supreme court, or of any circuit court, a commissioner of the board of commissioners to quiet land titles, or master in chancery; provided such signatures are attached or appended to any decree, order, certificate, affidavit, or other judicial or official document.