J-A06031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TERESA GOODENOW AND DON GOODENOW | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | No. 625 WDA 2022 |
| RONALD J. MCMAHAN AND WEST PENN SPORTSMEN'S CLUB A/K/A AMATEUR TRAPSHOOTING ASSOCIATION | : | |

Appeal from the Order Entered May 6, 2022
In the Court of Common Pleas of Westmoreland County Civil Division at
No(s): 3389 of 2017

BEFORE: OLSON, J., NICHOLS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:         **FILED: April 19, 2023**

     Teresa Goodenow and Don Goodenow (the Goodenows) appeal from the order entered in the Court of Common Pleas of Westmoreland County (trial court) that granted the motion for summary judgment of West Penn Sportsmen's Club a/k/a Amateur Trapshooting Association (West Penn). They argue there was a genuine issue of material fact about the subject dog's

_____

[*] Retired Senior Judge assigned to the Superior Court.

"dangerous propensities" and whether West Penn had notice of them.[1]  We affirm.

We take the following factual background and procedural history from the trial court's July 15, 2022 opinion and our review of the record.

## I.

## A.

This case involves an incident that occurred on West Penn's property on July 11, 2015, when McMahan's dog (Molly) allegedly attacked the Goodenow's dog (Rose) resulting in injuries to Teresa Goodenow that she incurred when she dove for her dog.

West Penn is a Pennsylvania non-profit corporation and its land is used for trap and target shooting events.  McMahan has been president and groundskeeper at West Penn for approximately 20 years and resides on the property with his family in a mobile home and ran the West Penn board meetings at the clubhouse on the West Penn property.  He testified at his deposition that he ran the West Penn board meetings and "oversee[s] that the club is operating under the bylaws.  And pretty much if a decision has to be made on the spot, [he is] usually the one that makes the on-the spot

---

[1] Ronald J. McMahan (McMahan) was the owner of Molly, the subject dog.  The Goodenows entered into a settlement with him pursuant to a Pro Rata Joint Tortfeasor Release dated May 27, 2020.  (**See** Complaint, at Exhibit A). McMahan is not a party to this appeal.

decisions." (McMahan Deposition, at 9-10). McMahan and most of the West Penn board members would be at the trapshooting events, with some people working in the office and others, like McMahan, working the trap range.

McMahan has always had a dog living with him, and the West Penn board members have always known that McMahan kept dogs on the property, although there was never any discussion about how he should handle them when other groups were utilizing the West Penn site. There was a fenced-in area near the McMahan residence where he would securely keep his dog. McMahan stated that he is unaware of any incidents or reports to West Penn that Molly has ever exhibited aggressive tendencies. When asked whether at any time prior to the alleged accident they had "ever taken any action to ensure that persons lawfully on [its] premises … were protected from Mr. McMahan's dog," West Penn answered that "the Board of West Penn … relied upon Ronald McMahan to control his dog." (Goodenows' Brief in Response to Motion for Summary Judgment, Exhibit 3, West Penn Supplemental Response to Interrogatories, at ¶ 28). Depending on the evening, he would allow Molly, a chocolate Labrador that he had owned since December 2011, to roam the West Penn property unsecured once the shooting events had ended for the day. Over the years he had owned her, Molly would interact with other West Penn club members' dogs, adults and young children. McMahan never saw Molly bite, growl, grit her teeth or display any type of violent behavior toward other dogs or people. (*Id.* at 33-34); (McMahan Interview, at 6). When Molly

saw other dogs, she would "typically run up to them because she is territorial, it's her home, but then she just stops and sniffs them and doesn't do anything." (McMahan Interview, at 5). McMahan has no "beware of dogs" signs on his trailer and one was never requested to be put up. (**See** McMahan Deposition, at 35).

**B.**

Don Goodenow was a member of a Konne-Yaut Indians shooting club that was holding its annual trapshooting event at West Penn from July 8-12, 2015. The Goodenows and many of the members of the Konne-Yauts chose to camp on the West Penn premises throughout the event, and some members, including the Goodenows, brought their dogs. The Goodenows' dog, Rose, is an approximately five-pound shih tzu poodle.

The Goodenows and Rose arrived at West Penn on July 8, 2015, for the trapshooting event. On the evening of July 8, 2015, Teresa Goodenow was inside the camper unpacking with the screen door closed. Rose was sitting at the screen door watching Don Goodenow, who was outside setting up the campsite, when Molly went to the screen door of their camper and allegedly "attempted to attack [their] dog." (Complaint, at ¶ 11). Don stated that Molly's hair was raised on her back, but when he yelled at the dog, it immediately left without causing any injuries or damage. The entire incident lasted ten to fifteen seconds. Teresa Goodenow's description of events mirrored her husband's. (**See** Donald Goodenow, Jr. Deposition, at 14, 17).

When Don heard a commotion from the neighboring site of the Carneys, he went to investigate and learned that Molly had approached their pugs. (*Id.* at 14-15). According to Don, McMahan immediately came to retrieve Molly and he said that he had trained the dog "to kill woodchucks on the property and [s]he thinks all small dogs are woodchucks." (*Id.* at 15). The Goodenows did not lodge a complaint with West Penn about Molly running up to their door. (*Id.* at 20-21).

## C.

On July 11, 2015, after the trapshooting events had ended for the day, the Goodenows were sitting outside of their camper with Rose and some friends. At the same time, McMahan was outside in a group with an unleashed Molly. Individuals were playing with and petting Molly. When a woman from the group called the dog away to walk with her, Molly started to do so and then saw Rose and ran toward her. It appeared to McMahan that she startled the Goodenows' group.

The Goodenows describe the events slightly differently. They maintain that Molly suddenly appeared on their campsite, immediately grabbed Rose and pulled her by the head. (*Id.* at 23-25); (*See* Teresa Goodenow Deposition, at 35-36). As one of the men (Ed) in the group grabbed Molly's collar, Teresa Goodenow jumped from her own chair and grabbed Rose, tripping and falling with the dog in her arms, allegedly resulting in injuries. (Teresa Goodenow Deposition, at 37-40); (Donald Goodenow, Jr. Deposition,

at 24-27). When Ed let go of Molly's collar, Don chased her off the site and she went back to McMahan. (Donald Goodenow, Jr. Deposition, at 25, 27). Molly did not bite or directly injure Teresa and Rose was not injured at all as a result of the incident. The couples remained outside chatting for the rest of the evening. (Teresa Goodenow Deposition, at 38); (Donald Goodenow, Jr. Deposition, at 44-45).

Don did not speak with McMahan about the incident, but he believed that Ed told McMahan not to go to the Goodenows' campsite because people were upset. (*See id.* at 28). Don spoke with Scott Crido (Crido), the High Chief of the Conneaut Indians Shooting Club, member of West Penn and brother to West Penn's vice-president, but Crido told the Goodenows there was nothing he could do because they were West Penn's guests. (*See id.* at 29). Although he did not indicate that he was going to speak to anybody at West Penn about the incident, Don Goodenow thought it "would get relayed." The Goodenows did not fill out an accident report about the July 11, 2015 incident with West Penn and stayed until the conclusion of the event the next day. (Teresa Goodenow Deposition, at 26-32, 35-38, 40, 43-46); (Donald Goodenow, Jr. Deposition, at 14-15, 17-19, 21, 23-29).

**D.**

On August 3, 2017, the Goodenows filed a civil complaint against West Penn[2] asserting negligence for West Penn's violation of its duty to provide a safe environment and failing to require McMahan to either remove his dog from the property or to keep his dog restrained, as well as a loss of consortium claim filed by Don Goodenow.

On September 13, 2021, after the pleadings were closed and the parties had engaged in discovery, West Penn filed a motion for summary judgment on the basis that it was an out-of-possession landlord and the Goodenows failed to produce evidence that it "had actual notice of Molly's alleged vicious propensities." (Motion for Summary Judgment, at ¶ 42). The Goodenows responded that West Penn had actual notice because "any knowledge of McMahan regarding his dog, as an agent, President, employee and representative of West Penn, was also knowledge that can be imputed to West Penn." (Goodenows' Brief in Response to Motion for Summary Judgment, at 5). They added that they "stress that they are not merely propounding a vicarious liability/respondate (sic) superior theory of liability against West Penn. They are alleging that West Penn, as the owner of the premises where this accident occurred, owed its own independent duties to the [Goodenows]

_____

[2] The complaint also asserted claims against McMahan, but, as stated previously, he and the Goodenows entered into a settlement agreement.

and others who had gathered there for activities operated and sanctioned by West Penn." (*Id.* at 8-9).

The trial court granted West Penn's motion for summary judgment finding that, "[b]ecause the Goodenows have presented no evidence of any dangerous propensities on the part of McMahan's dog, [it] need not reach the issue of actual notice to West Penn." (Order, 5/06/22, at 6).

The Goodenows filed a timely notice of appeal and court-ordered statement of errors. *See* Pa.R.A.P. 1925(b). They raise two issues for our review: did the trial court err in granting summary judgment where there were genuine issues of material fact about whether (1) McMahan's dog "had exhibited dangerous propensities, behavior or characteristics prior to the" July 11, 2015 incident; and (2) West Penn had notice and therefore "is liable for the actions of McMahan's dog at the time of the incident[.]" (Goodenows' Brief, at 8).[3]

---

[3] In reviewing a challenge to an order granting summary judgment, "[w]e view the record in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Shellenberger v. Kreider Farms*, ___ A.3d ___, 2023 WL 29338, at *4 (Pa. Super. filed Jan. 3, 2023) (citation omitted). "Only where there is no material fact and it is clear that the moving party is entitled to judgment as a matter of law will summary judgment be entered." *Id.* (citation omitted). "Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion." *Id.* (citation omitted).

## II.

## A.

The Goodenows argue that "there was a genuine issue of material fact about whether McMahan's dog, Molly, had exhibited dangerous propensities of behavior" prior to the July 11, 2015 incident that precluded the grant of summary judgment. West Penn responds that neither McMahan nor West Penn had actual knowledge of Molly's alleged vicious propensities because she was not previously a violent dog that exhibited any vicious propensities.

Generally, "in negligence actions arising from the conduct of animals, the animal's owner is the person responsible for injuries to others caused by his or her pet." *Rosenberry v. Evans*, 48 A.3d 1255, 1258 (Pa. Super. 2012) (citation omitted). In order to establish a cause of action in negligence against a landlord for injuries caused by his tenant's[4] dog, it must be proven that the landlord had "actual knowledge that his tenant harbors a dog with dangerous propensities." *Id.* at 1262 (citations omitted).

> Our High Court has defined a dangerous or vicious propensity broadly. A dangerous propensity includes "a propensity or tendency of an animal to do any act that might endanger the safety of the person and property of others in a

---

[4] The Goodenows argue that "that there is no evidence that there was a landlord/tenant relationship between McMahan and [West Penn]." (Goodenows' Brief, at 26). They state that, "[a]ll that is known is that McMahan was the groundskeeper and resided on a portion of the premises owned by [West Penn], presumably to better enable him to fulfill his obligations as [West Penn]'s man-on-the- ground[.]" (*Id.*). Although our review of the record confirms this observation, it is not dispositive because of our conclusion that McMahan was not on notice of any dangerous propensities.

given situation." *Groner v. Hedrick*, 403 Pa. 148, 169 A.2d 302, 303 (1961) (citing Restatement (Second) of Torts § 518(1)). In *Groner*, the Court recognized that a large overly-friendly dog that jumps onto people may be as dangerous as a vicious one. Our Supreme Court ruled, "[T]he law makes no distinction between an animal dangerous from viciousness and one merely mischievous or dangerous from playfulness," and the animal's motivation or "the mood in which it inflicts harm is immaterial." *Id.*

*Rosenberry*, 48 A.3d at 1261 (one case citation omitted).

In this case, the trial court explained:

Looking at the evidence set out by the parties, the only alleged dangerous propensity set forth by the [Goodenows] related to the July 8, 2015 incident. From December of 2011 through the incident McMahan had never seen or received knowledge of any alleged dangerous propensity. Plaintiff Teresa described Molly's behavior on July 8th as she "saw Rose, dove for her [and] hit the screen door." (Deposition of Teresa Goodenow, 5/16/18, at 30). She stated that her husband yelled and Molly left the area. (*See id.*). Later in her deposition Plaintiff Teresa described Molly's approach at that time as she "just walked up" to the camper. (*Id.* at 17).

Plaintiff Don described the incident as follows: "[Molly] bolted towards the camper door where Rose, our dog, was standing and went up against the screen and of course then I yelled at [her] and [she] went around the corner and left." (Deposition of Donald Goodenow, Jr., 5/16/18, at 14). He stated that Molly had "hair raised up on [her] back" and she "bounced off" of their camper's screen door with her nose. (*Id.* at 17). There was no testimony as to any barking, growling, snapping or other similar behavior on the part of Molly.

Looking to all evidence provided by the [Goodenows], they have failed to produce any evidence which would be sufficient to submit to a jury that would suggest that McMahan's dog had dangerous propensities as required under Pennsylvania law. Even under a view of the facts most favorable to [the Goodenows], Molly ran or walked up to the camper towards Rose, hit and/or bounced her nose off of the screen door, and left immediately when confronted by Plaintiff Don. The hair on her back might have been raised.

> There is no evidence of any barking, scratching, growling or biting. She did not jump up onto any humans or other dogs. The recitation does not meet even the extremely liberal standard for "dangerous propensities" as described by the case law …. None of the above behavior approaches a point that it could possibly "endanger the safety of the person and property of others in a given situation." **Rosenberry**, 48 A.3d at 1258. To allow [the Goodenows] to proceed on this evidence would render the distinction between dangerous propensities and typical behavior exhibited by all dogs merely meaningless. Because there is insufficient evidence of any dangerous propensities harbored by McMahan's [] dog, it is not proper for the issue to proceed to a fact finder.

(Order, 5/06/22, at 3-5) (some record citation formatting provided). We agree with the court that, even viewing the evidence in the light most favorable to the Goodenows, it did not create a genuine issue of material fact.

The evidence was that prior to the ten to fifteen second July 8, 2015 interaction, there had never been any complaints to McMahan or West Penn about Molly's behavior, vicious or otherwise, and McMahan had not observed any violent behavior by Molly with any dog or person. On July 8, 2015, while she bumped the screen door of the Goodenows' camper, there was no testimony that she growled, clawed at the screen door or hit it with enough force or aggression to cause any damage. In fact, although Don Goodenow testified that McMahan told him that he had trained Molly to attack woodchucks and that she sometimes attacked small dogs, the trial court noted that "[a]bsolutely no evidence was presented to show that McMahan's dog had previously attacked any dogs at all or that McMahan knew that his dog had allegedly attacked any dogs." (Trial Court Opinion, 7/15/22, at 2).

Moreover, we are not persuaded by the caselaw on which the Goodenows rely because it is distinguishable. For example, *Rosenberry* involved a dog with an involuntary tic that caused it to clench its teeth in a biting motion and resulted in a disfiguring injury to a child. *See Rosenberry*, 48 A.3d at 1261. While the dog was not vicious or aggressive, the court found that there was "sufficient evidence from which a jury could reasonably infer that the dog displayed a characteristic, even though non-aggressive, that rendered it dangerous." *Id.*

*Deardoff v. Burger*, 606 A.2d 489 (Pa. Super. 1992), involved, in pertinent part, the appellant's argument that the court should have given a "single bite" jury instruction in a case involving a dog biting a child. *Deardoff*, 606 A.2d at 493. In deciding the issue, the Court considered the language on which the Goodenows now rely:

> As soon as the owner knows or has good reason to believe that the animal is likely to do mischief, he must take care of him; it makes no difference whether this ground of suspicion arises from one act or from repeated acts. *The only restriction is that the act done must be such as to furnish a reasonable inference that the animal is likely to commit an act of the kind complained of.*

*Id.* at 493 (citation omitted; emphasis in original); (*see* Goodenows' Brief, at 21). The Court noted there was testimony that the dog had a great personality and was kind, but he had previously bitten another person who had kicked him several times. *Id.* at 494. The Court concluded that a single bite jury instruction was not warranted because the appellant did not prove that the dog had "unmistakable vicious tendencies" known to the defendant. *Id.*

(citation omitted). Not only is this case factually and procedurally distinguishable, but it is also not persuasive where Molly bumping against the Goodenows' screen door, absent more, does not reflect "unmistakable vicious tendencies."

Finally, in **Groner v. Hedrick**, 169 A.2d 302 (Pa. 1961), the Court found that the defendant owner had notice of the dangerous propensities of his Great Dane where it repeatedly jumped up on people and knocked them down in his home, which is exactly what the dog did that resulted in the plaintiff's injuries. **See Groner**, 169 A.2d at 303. In **Franciscus v. Sedvik**, 35 A.3d 1092 (Pa. Super. 2016), a dog was found to have dangerous propensities where its owner required that it wear a muzzle when it walked, had a "Beware of Dog" sign and did not permit it around other dogs or children. **See Franciscus**, 35 at 1093.

These cases are clearly distinguishable where the only thing that McMahan knew was that on July 8, 2015, Molly ran to the screen door of the Goodenows' camper upon seeing Rose and then ran off when Don yelled. As the court noted, "[t]o allow [the Goodenows] to proceed on this evidence would render the distinction between dangerous propensities and typical behavior exhibited by all dogs merely meaningless." (Trial Ct. Op., at 5).

Based on all the foregoing, we agree with the trial court that the Goodenows failed to produce any evidence of Molly's alleged dangerous propensities.

**B.**

The Goodenows also argue that a genuine issue of material fact remains as to whether West Penn was on notice of Molly's dangerous propensities and, therefore, can be held liable. West Penn responds that neither the Goodenows nor anyone else ever informed it that Molly had any dangerous propensities, and since it did not have actual knowledge, it cannot be held liable for her behavior.

The trial court did not address the notice issue in its May 6, 2022 order due to its disposition that the Goodenows failed to present any evidence of Molly's dangerous propensities. However, even assuming *arguendo*, as the Goodenows argue, that notice to McMahan of the July 8, 2015 incident was notice to West Penn, because the Goodenows have failed to provide evidence that Molly's behavior exhibited dangerous propensities, there necessarily would have been no dangerous propensities of which West Penn would have been aware. Accordingly, we affirm the trial court's order granting West Penn's motion for summary judgment.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/19/2023