# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-01411-SCT

*JANET OLIER*

*v.*

*DONNA BAILEY*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/02/2013 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| TRIAL COURT ATTORNEYS: | BRENT M. BICKHAM |
| | C. PAIGE HERRING |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | BRENT M. BICKHAM |
| ATTORNEY FOR APPELLEE: | C. PAIGE HERRING |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART AND REMANDED - 12/11/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     Janet Olier was attacked and chased by a domestic goose in Donna Bailey's yard. As she attempted to flee, she fell and broke her arm. Olier sued Bailey in the County Court of Jackson County under a theory of premises liability and, alternatively, under the dangerous-propensity rule. The trial court granted summary judgment because it found that Olier was a licensee on Bailey's property and that Bailey did not breach her duty of care toward Olier. It also denied relief under the dangerous-propensity rule because there was no evidence that the particular goose that bit Olier ever had exhibited dangerous propensities prior to the

incident. Olier appealed to the Jackson County Circuit Court, which affirmed. Olier then filed the instant appeal. We hold that, while Olier cannot, as a matter of law, pursue her claim under her theory of general premises liability as a matter of law, she can proceed under the dangerous-propensity theory. Accordingly, we affirm the trial court judgment in part, reverse it in part, and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶2.     Olier and Bailey became acquainted through a gardening website called "Dave's Garden," a message board of sorts for gardening enthusiasts to share their hobby. On the day of Olier's injury, she visited Bailey at her home to view some of Bailey's plants. Bailey, who has a "Beware–Attack Geese" sign in her yard, also informed Olier verbally that she kept geese in her yard. Bailey kept several five-gallon buckets of water in the yard lined along the edge of the porch to provide the geese drinking water and to act as a barrier so the birds could not walk onto the porch.

¶3.     Olier wanted to see Bailey's blooming banana plant in the yard, and she ventured beyond the buckets while Bailey remained on the front porch. As Olier stepped over the buckets, a goose squawked at her. Olier said the goose was large and that its neck reached out as if it meant to bite her chest. She stepped back onto the porch, within the safe confines of the bucket-fence, and told Bailey she could not go out into the yard because of the geese. Bailey assured Olier that the geese would not bite if Bailey was with her and offered Olier a bamboo pole with which to fend off the birds. When the two women entered the yard, Bailey attempted to lead the geese away from Olier. However, the geese noticed Olier and approached her, squawking and hissing. Frightened by the geese, and thinking that the

2

bamboo pole was useless, Olier threw it to the ground. At this point, a goose reached out and nipped her in the "crotch area." Olier turned to flee, tripped over one of the buckets lining the patio, and fell, breaking her arm.

¶4.    Olier sued Bailey and her husband[1] in the County Court of Jackson County. For her injuries, Olier sought $200,000, the jurisdictional limit, plus court costs. Olier pursued her claim on two theories of liability: premises liability and liability under the dangerous-propensity rule. Bailey moved for summary judgment, arguing that Olier was a licensee at Bailey's home when she was injured and that Bailey did not breach her duty of care to Olier. Bailey also contended that the goose that attacked Olier had not exhibited dangerous tendencies previously, and thus the dangerous-propensity rule was inapplicable. Olier responded by arguing that Bailey had provided a bamboo pole to Olier for the explicit purpose of fending off the aggressive geese, which showed that Bailey knew about their aggressive and dangerous propensity.

¶5.    The trial court granted summary judgment in favor of Bailey, finding that Olier was a licensee, that Bailey did not breach her duty of care to a licensee, and that the dangerous-propensity rule did not apply. The Jackson County Circuit Court affirmed, and this appeal soon followed. Bailey has filed an additional motion to strike portions of Olier's brief.

### BAILEY'S MOTION TO STRIKE PORTIONS OF OLIER'S BRIEF

¶6.    In her Motion to Strike Portions of Olier's Brief, Bailey argues that several of Olier's arguments on appeal should be struck because they were not raised before the trial court. We

---

[1]Bailey's husband later was dismissed from the suit with prejudice.

find that the motion is not well taken and should be denied. We are not inclined to parse through the different arguments that may or may not have been made at the trial level for the purpose of determining whether to strike them from a brief. If the record reveals that an argument was not made before the trial court, we will address it appropriately. Accordingly, Bailey's Motion to Strike Portions of Olier's Brief is denied.

**ANALYSIS**

¶7.     Olier's issues on appeal are as follows:

I.      Do genuine issues of material fact exist regarding whether Olier was an invitee or licensee, and, if Olier was a licensee, did Bailey nevertheless breach her duty of care to Olier?

II.     Should the **Hoffman** affirmative negligence doctrine, which applies to business premises, be expanded to cover domiciles?

III.    Do domestic fowl fall under the dangerous propensity rule, and did Bailey have knowledge of her geese's dangerous propensity?

¶8.     Our well-known standard of review from a trial court's grant of summary judgment is *de novo*. **Double Quick, Inc. v. Moore**, 73 So. 3d 1162, 1165 (¶ 7) (Miss. 2011). We view the evidence "in the light most favorable to the party against whom the motion has been made." **Id.** If the movant can "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law[,]" then summary judgment is appropriate. M.R.C.P. 56(c).

**I.      Janet Olier was a licensee as a matter of law.**

¶9.     In determining whether liability attaches to a landowner, this Court must determine (1) the status of the visitor, whether trespasser, licensee, or invitee; (2) the duty that the landowner owed to the visitor based on that status; and (3) whether the landowner breached

4

his or her duty of care to the visitor. ***Hoffman v. Planters Gin Co.***, 358 So. 2d 1008, 1011 (Miss. 1978).

### A. Olier's status.

¶10. Olier argues that genuine issues of material fact exist regarding whether she was an invitee on the day that she visited Bailey's home. Bailey argues that Olier was a licensee as a matter of law, and the trial court agreed.

¶11. A person is classified as a licensee if he or she enters the property for "his or her own convenience, pleasure or benefit pursuant to the license or implied permission of the owner. . . ." ***Massey v. Tingle***, 867 So. 2d 235, 239 (¶ 14) (Miss. 2004). We classify an invitee as a visitor "who goes upon the premises of another in answer to the express or implied invitation of the owner or occupant for their mutual advantage." ***Hoffman***, 358 So. 2d at 1011. The difference in classification is important; a landowner owes a much higher duty of care to invitees than he or she does to licensees. The landowner owes an invitee the duty "to keep the premises reasonably safe and when not reasonably safe to warn only where there is hidden danger or peril that is not [in] plain and open view." ***Little by Little v. Bell***, 719 So. 2d 757, 760 (Miss. 1998) (citation omitted). On the other hand, the landowner owes a licensee the duty only "to refrain from willfully or wantonly injuring him." ***Id.*** (citation omitted).

¶12. The trial court found that Olier was a licensee. Olier argues that the parties were friends, that they shared an interest in gardening, that they had visited each other's yards and had gone to trade shows, and that they traded plants and flowers with each other. In other words, she argues that her visit with Bailey to discuss their shared hobby of gardening and

5

to take a sample of Bailey's plant was mutually beneficial, such that her status was that of an invitee. Bailey argues that she received no benefit from Olier that would confer upon Olier the status of invitee. Instead, Bailey argues the entire purpose of the visit was for Olier to see Bailey's plants, and perhaps take a sample home, which would have benefitted only Olier.

¶13.    There is case law establishing that a social guest can become an invitee if sufficient benefit is bestowed upon the landowner by nature of the guest's visit. This Court has held that a visitor who went to the home of her mother to take the mother to a doctor was an invitee entitled to a higher degree of care. *Minor v. Eng'g Serv. Co., Inc.*, 304 So. 2d 45, 48 (Miss. 1974). More recently, in *Hall v. Cagle*, 773 So. 2d 928 (Miss. 2000), this Court confronted the classification of a guest who was helping the homeowner unload boxes, arrange furniture, and move into the house. The Court, citing *Minor*, held that the plaintiff "was at the home of the Cagles to perform a service for their benefit, i.e., to assist them in moving and unpacking." *Id.* at 930 (¶ 7). The Court held that the plaintiffs' service to the landowner was sufficient to render her an invitee, and held that she had "alleged and proved sufficient facts to make a prima facie showing that she was an invitee rather than a licensee such that" her suit should have survived summary judgment. *Id.* (¶ 8). *See also Pinnell v. Bates*, 838 So. 2d 198, 202 (¶ 14) (Miss. 2002) (holding that there was a factual dispute regarding the status of a visitor who came to a friend's home and helped out with housework because the homeowner was having back trouble, and summary judgment therefore was inappropriate).

¶14.    We find the facts in this case distinguishable from those in which we found an issue of fact regarding the entrant's status. In *Minor*, *Hall*, and *Pinnell*, the plaintiff was

6

performing a service for the landowner that conferred a genuine benefit on the landowner, whether that was helping take someone to a doctor, helping someone move in, or assisting with housework.[2] Here, Olier came at Bailey's invitation to view Bailey's plants. She did not assist Bailey with housework, help her move, take her somewhere, or do anything to benefit Bailey. Instead, she came entirely for her own benefit to look at Bailey's plants and perhaps take a sample home with her.

¶15.    Accordingly, there is no issue of fact regarding Olier's status. She came to Bailey's home at Bailey's invitation entirely for her own benefit. Olier was a licensee as a matter of law.

### B.    Bailey did not breach her duty of care as a landowner to Olier.

¶16.    Olier argues that, even if she was a licensee at Bailey's home, questions of material fact remain regarding whether Bailey breached her duty of care to her. Olier argues that the geese were a hidden danger, and that her being in the yard with them, with her access to the porch blocked by a wall of buckets, was tantamount to a trap. She argues that Bailey's geese

---

[2]The Court has deemed these types of visits mutually beneficial, although in fact the benefit to the landowner clearly is unilateral. No benefit, other than the pleasure of assisting a friend, inures to the visitor who assists the landowner without compensation. This confusion about *mutual* benefit probably is a result of the classical definition of an invitee as a customer of a business who receives the benefit of purchasing goods from the premises owner. In a social context, the benefit to the visitor disappears, except for a vague altruistic benefit which this Court never has recognized as one deserving of invitee status. Accordingly, our rule for classifying such social guests as invitees is more properly deemed one of unilateral benefit to the landowner. If a social visitor's purpose is to confer a benefit upon the landowner, then that visitor is classified as an invitee. Of course, if there is some mutual benefit, such as payment for the assistance, the visitor clearly is an invitee.

expertise and her knowledge of their aggressive propensity militate toward a finding that she willfully and wantonly injured Olier.

¶17.    As Olier was a licensee, Bailey owed her the duty "to refrain from willfully or wantonly injuring" her. *Little by Little*, 719 So. 2d at 760. This Court also has held that, against a licensee, a landowner has a duty "not to set traps for him by exposing him to hidden perils." *Marlon Inv. Co. v. Connor*, 246 Miss. 343, 351, 149 So. 2d 312, 315 (1963). However, "[o]nce the licensee in fact discovers the danger, he may not later complain of it." *Id.* at 316. As for willful and wanton injury, this Court has stated:

> Willfulness and wantonness connote knowingly and intentionally doing a thing or wrongful act. . . . The guest assumes the ordinary risks which are attached to the premises. No exception is made to the rule because of the fact that the guest enters on the host's express invitation to enjoy his hospitality. A host merely offers his premises for the enjoyment of his guests with the same security which the host and members of his family who reside with him have.

*Raney v. Jennings*, 248 Miss. 140, 147-48, 158 So. 2d 715, 718 (1963).

¶18.    Here, the geese were not a hidden danger. Bailey had a sign warning visitors of their presence, and Olier saw them in the yard before she stepped onto it. The water buckets were plainly visible, and Olier was aware of them, as she had to step over them to enter the yard. Bailey offered a bamboo stick for Olier to use in protecting herself from the geese, an action that was at odds with any intent to injure. Bailey accompanied Olier into the yard, another factor which weighs against willful and wanton injury. There is no evidence in the record that Bailey either "knowingly or intentionally" allowed her domestic geese to roam the yard to bite Olier, or placed the buckets of water in such a manner that would constitute a hazard. We hold that Bailey did not breach her duty of care to Olier, a licensee, as a matter of law.

8

¶19. Presiding Justice Dickinson contends that Bailey's duty of care toward licensees on her property is the same regardless of the nature of the negligent activity involved. This is unworkable for several reasons, the main one being that the presence of domestic animals cannot rightly be said to be a condition of the premises.[3] This Court never has held, and the dissent points to no authority that does hold, that keeping animals on one's property is the same as having "spills on the floor, cracks in the sidewalks, improperly stacked shelves, or exposed electrical wiring." All of the examples offered by the Dickinson dissent are stationary conditions of the property that remain in place unless moved or changed by the landowner. Animals exist independently of the property; they are capable of independent movement and action and present different potential for harm in different places to different persons at different times. This is one of the many reasons that animals should not be considered conditions of the property. Accordingly, causes of action for injuries related to animal attacks should be maintained independently of premises-liability actions, which in some cases may be pled as separate counts or claims in the same civil pleading.

¶20. Several of the examples cited by Justice Dickinson are inapposite to the situation before us, as they come from cases in which the *only* way the plaintiff could have sued the landowner was under a theory of premises liability because the landowner had no ownership or control over the person or thing that caused injury to the plaintiff. In *Albert v. Scott Truck's Plaza,* 978 So. 2d 1264, 1265 (¶ 2) (Miss. 2008), the plaintiff's wife was hit and

---

[3]This much was admitted by the appellee in her memorandum in support of her motion to strike portions of Olier's brief, in which counsel for Bailey stated, "Candidly, counsel would assert that the animal law would appear to apply because the incident was not one involving a defect or issue with the premises."

killed by a truck driven by a third party with no relationship to the landowner. The only avenue of relief available to the plaintiff against the landowner was via premises liability, as the landowner did not own or operate the truck that had killed the decedent.

¶21. Similarly, in the cases involving landowner liability for injuries caused to invitees or licensees on premises, premises liability was the *only* way to file suit against the landowner. In *Kroger v. Knox*, 98 So. 3d 441, 442 (Miss. 2012), the plaintiff sued the landowner because the plaintiff was robbed on the premises by a third party. Had she been robbed in the street, or on other public property, she could have sued only the person who had robbed her.[4] The grocery store was involved only because the incident had occurred *on the store's premises*. The same goes for a shooting in a convenience store parking lot,[5] or sexual assault at a hotel,[6] or a shooting at an apartment complex.[7] In all of those cases, the entity causing the actual injury was not owned by or was not under the control of the premises owner; so premises liability was the only avenue through which the premises owner could have been brought into the litigation.

¶22. However, in the case of an animal or a group of animals *owned by the landowner*, the scenario is notably different. Premises liability then is no longer required as a means through which the land/animal owner may be brought into court. Justice Dickinson would render

---

[4]However, if the plaintiff had been attacked by a dog owned by the premises owner while not on the premises, suddenly animal-owner law would have applied and the premises owner, now being sued as an animal owner, still could have been sued in tort.

[5]*Double Quick, Inc. v. Moore*, 73 So. 3d 1162, 1164 (Miss. 2011).

[6]*Doe v. Jameson Inn, Inc.* 56 So. 3d 549, 551 (Miss. 2011).

[7]*Thomas v. Columbia Grp., LLC*, 969 So. 2d 849, 851 (Miss. 2007).

licensees and trespassers unable to present their claims to triers of fact if they are attacked by the landowner's animal(s) on the landowner's premises. However, the same person instantly would be able to proceed with his or her claims if similarly attacked just outside the property. An animal owner's duty to the public with regard to his or her animals should not be subject to wide ranges of duties which depend on the various statuses of injured persons. Animals are active and they are mobile. They move with minds of their own, in ways, and with motivations, that machines and vehicles which require human intervention to function do not. *See Cade v. Beard*, 130 So. 3d 77 (Miss. 2014) (analyzing suit based upon injury and death suffered in all-terrain vehicle accident on defendant's property under the theory of premises liability). We do not hold today that only stationary objects or conditions implicate premises liability, but only that injuries caused by animals owned by premises owners do not.

¶23. Bailey did not breach her duty of care toward Olier as a landowner, but as an animal owner. The geese were not a condition of the land to which such a duty attached. The two torts exist independently of one another. One does not have to have been injured on another's property to maintain a civil action for damages caused by a defendant's animal. The dangerous-propensity theory of liability exists independently of premises liability, and Bailey's duty of care as an animal owner is different than her duty of care as a landowner.

## II. The *Hoffman* affirmative-negligence doctrine.

¶24. Although Olier indisputably was a licensee when this incident occurred, this Court has provided an exception to the willful/wanton standard of care owed to licensees. In *Hoffman*, this Court held that the duty of care to a licensee could be elevated, and that a landowner

11

could be "liable for injury proximately caused by his affirmative or active negligence in the operation or control of a business," and that, in that event, "the standard of ordinary and reasonable care has application." *Hoffman*, 358 So. 2d at 1013 (emphasis added). Justice Coleman makes a compelling and persuasive argument to extend the *Hoffman* affirmative-negligence doctrine to the realm of private, nonbusiness landowners. However, as we find that liability as an animal owner is analyzed separately from liability as a landowner, the proposed extension has no place in our analysis.

### III.     The dangerous-propensity rule.

¶25.    So, Olier cannot proceed under a theory of premises liability as a matter of law. However, while Bailey did not breach her duty of care toward Olier as a landowner, whether Bailey breached her duty of care toward Olier as an animal owner is a different question. Olier contends that the dangerous nature of Bailey's geese, Bailey's knowledge of their dangerous propensity, and her negligence in keeping them in the yard when Olier was injured, allow her to proceed with an action for negligence against Bailey. Under the dangerous-propensity rule, this Court has stated that an animal owner may be exposed to liability for an attack by his or her animal when:

> (1) There is some proof that the animal has exhibited some dangerous propensity or disposition that the owner was aware of prior to the attack complained of; and,

> (2) There is proof that the owner reasonably should have foreseen that the animal was likely to attack someone.

12

*Poy v. Grayson*, 273 So. 2d 491, 494 (Miss. 1973). The Court noted that "'[t]he gist of the action has been characterized as the keeping of the animal with knowledge of its vicious disposition.'" *Id.* at 493 (quoting 4 Am. Jur. 2d *Animals* § 86 (1962)).

¶26.    In *Poy*, the plaintiff, a garbage collector, sued the owner of the premises when one of the defendant's dogs reached through a fence and bit the plaintiff while he was collecting garbage. *Id.* at 492. The Court denied relief to the plaintiff, because, although he stated that the offending animal was a watch dog and the plaintiff believed the dog to be dangerous, the dog had not evidenced any aggressive behavior or dangerous propensity. *Id.* at 494. The Court found nothing "in the record capable of supporting a finding that this puppy had previously exhibited any such character or disposition as would reasonably have put [the defendant] on notice or enabled [him] reasonably to foresee that it might attack or bite someone." *Id.* at 493-94. Based on the lack of evidence of a dangerous propensity, the Court held that the "jury should have been peremptorily instructed to find for" the defendant. *Id.* at 491-92.

¶27.    In *Mongeon v. A & V Enterprises, Inc.*, 733 So. 2d 170, 170 (¶ 2) (Miss. 1997), the plaintiff was attacked by two dogs while walking from her trailer to the washateria on the premises of the trailer park in which she resided. At trial, the plaintiff adduced testimony showing that another resident of the trailer park had informed the manager of the park that the dogs had growled at her on a previous occasion. *Id.* at 172 (¶ 9). Trailer park management assured the complainant that the dogs would be tied up. *Id.* The jury found for the plaintiff, but the trial court granted a motion for judgment notwithstanding the verdict for the defendant. *Id.* at 171 (¶ 4). The plaintiff appealed.

¶28.    This Court reversed. In so doing, the Court looked to other jurisdictions, which had held that "'[a]ny tendency of a dog to injure persons, whether the dog acts from a purpose to do bodily harm, from ill-temper, or only playfulness, is a dangerous propensity for which a keeper who has reason to know of such habit will be liable.'" *Id.* (¶ 11) (quoting *Boosman v. Moudy*, 488 S.W.2d 917, 920 (Mo. Ct. App. 1972)). The Court also relied on *Farrior v. Payton*, 562 P.2d 779, 786 (Haw. 1977), which held that a dog which had barked on numerous occasions at strangers on the property had exhibited vicious propensities, even though the dog never had bitten anyone. The Court noted with approval that such evidence as barking and chasing was "deemed sufficient to present to a jury the issue of whether the owners of the dog were negligent and liable for the plaintiff's injuries which resulted from her attempt to escape from the defendant's dog." *Mongeon*, 733 So. 2d at 172 (¶ 11) (citing *Farrior*, 562 P.2d at 787).

¶29.    Based upon the holdings of the Missouri Court of Appeals and Supreme Court of Hawaii, this Court held that "a reasonable jury could have found that the incident in which Brown's dogs growled at Donna Nelson near the washateria constituted an exhibition of a dangerous or vicious propensity by Brian Brown's black Labrador retrievers." *Mongeon*, 733 So. 2d at 172 (¶ 12). As the Court considered the evidence in the light most favorable to the plaintiff, it held that there was credible evidence from which the jury could find for her. *Id.*

¶30.    In this case, we are not dealing with a dog, but with a young goose.[8] Despite the youth of the goose, Olier claims it was large enough to reach her chest and was behaving

_____

[8]Bailey maintains that all of the adult geese were restrained when the incident happened, and that only goslings were in the yard.

aggressively. Her encounter with the geese in the yard can be divided into two incidents. She initially went out alone, but was frightened by the geese and returned to the refuge of the porch. At that point, the aggressive nature of the geese was apparent. After Bailey witnessed her geese squawking and hissing at Olier and thereby causing her to retreat to the porch, Bailey agreed to accompany her into the yard to distract the geese and lead them away from Olier. Bailey also provided Olier a bamboo pole and "briefly instructed Olier on how to *fend off* the goslings." (Emphasis added.) With Bailey distracting the geese, and Olier armed with her bamboo goose stick, Olier was prepared to reenter the yard proper. When she did, the observant geese noticed and approached her again. Olier thought that the stick was insufficient to protect her and abandoned it. At that point, a young goose bit her in the crotch, whereupon Olier turned and fled, tripping and breaking her arm in the fall.

¶31.    Bailey's main argument is that the particular goose which bit Olier never had exhibited a dangerous propensity in the past, i.e., it never had bitten or chased anyone before. Although an adult goose of the same gaggle admittedly had run a police officer off the property previously, that goose was locked up when the attack upon Olier occurred. Bailey argues that, because there was no evidence that the particular goose in question had exhibited a dangerous propensity, she therefore had no actual or constructive knowledge of a dangerous propensity on its part, and therefore she cannot be held liable for its actions.

¶32.    Olier argues first that it would be inherently unfair to require her to identify the particular goose that bit her and find evidence of that precise bird's having exhibited a dangerous propensity. Further, she contends that the real issue is foreseeability. Was Bailey on notice of the dangerous propensity of her gaggle of geese as a whole? Olier contends that

15

she was. Bailey saw her geese approach Olier aggressively, she saw Olier retreat to the porch, she armed Bailey with a stick and "instructed" her on how to "fend off" aggressive geese, and even went so far as to act as a decoy in an attempt to distract the geese so that Olier could attempt to venture into the yard surreptitiously. Olier argues that these actions, along with Bailey's expertise with geese, clearly evidenced that Bailey was aware of the dangerous propensities of her geese.

¶33.    This Court has never confronted the issue of an aggressive bird under the dangerous-propensity rule, and, it seems, few other jurisdictions have either. In an unpublished opinion, the Michigan Court of Appeals analyzed a goose attack on a delivery person. *Schisler v. Argenbright, Inc.*, 2006 WL 1688285, *1 (Mich. Ct. App. June 20, 2006). In that case, the delivery driver was attacked by a goose which pecked at his head, causing the driver to trip and fall, fracturing his wrist. *Id.* Summary judgment was denied the defendants because the plaintiff put on evidence showing that the geese had been nesting on the property and that one of the geese had been harassing visitors by hissing at them and chasing them. *Id.* The court noted that there was no evidence that the goose that attacked the driver was the one that had attacked before. *Id.* at n.1. The court held, although there may have been a question of whether the defendants had notice of the dangerous propensity of the goose in question, summary judgment to the defendants was appropriate because, "as tenants, their duty did not encompass the 'common areas' on the property, including the landscaping outside the building, where this incident occurred." *Id.* at *2. As the defendants did not own the goose, premises liability was the only avenue through which the plaintiff could maintain suit.

16

¶34. So, at least one court has recognized that bird attacks may be analyzed under the propensity rule. In *Schisler*, the court held that a goose attack may have been compensable but for the fact that the tenant defendant had no control over the common area in which the attack had occurred. Here, Bailey had total control over the area, as it was her yard, and, more importantly, she owned the goose that attacked Olier as well as the entire gaggle of geese of which the successful attacker was a member.

¶35. In this case, foreseeability is the fulcrum upon which liability turns. This Court first promulgated the propensity rule in *Poy*, holding that there had to have been some proof that the animal had exhibited some dangerous propensity prior to the attack complained of, and the owner had actual or constructive knowledge of that dangerous propensity. *Poy*, 273 So. 2d at 494. The rationale underpinning such a rule is that the courts will not hold a defendant liable for the injuries caused by his or her animal that were not reasonably foreseeable.[9] And in *Mongeon*, this Court held that an actual physical attack was not necessary to put an owner on notice of his or her animal's dangerous propensities, but instead held that evidence of barking, growling, and chasing can be sufficient to put an animal's owner on notice of the animal's dangerous propensity. *Mongeon*, 733 So. 2d at 172 (¶ 12).

---

[9] The Court also relied on language stating that an animal owner usually would not be liable for an injury caused by an animal acting in a way "not natural to the class of animals to which the offending animal belongs. . . ." *Poy v. Grayson*, 273 So. 2d 491, 494 (Miss. 1973) (quoting 3 C.J.S. *Animals* § 148(a) (1936)). Since the "great majority of dogs are harmless," the owner of a dog "is not liable for its biting a person . . . unless he has reason to know that it is likely to do so." *Id.* (quoting *Restatement of Torts*, § 509(f) (1938)). Geese may not be as universally harmless as dogs, although the plaintiff has offered no evidence to support such a statement.

¶36.    Generally, if the owner knows, or has reason to know, that the animal will be aggressive, or exhibits a dangerous propensity, that owner may be liable in tort. In that sense, it is possible for the dangerous-propensity rule, as articulated in *Poy* and *Mongeon*, to be unnecessary for the finding of foreseeability of the injury, and, consequently, liability for the injury. Instead, where an injury is a result of an animal's having behaved consistently with its general nature, it is irrelevant whether that particular animal had exhibited an unusually dangerous propensity previously, as its own inherent propensity precipitated the injury. This case also differs from both *Poy* and *Mongeon* because it involves a group of potentially dangerous animals, rather than the individual dog in *Poy* or the pair of dogs in *Mongeon*. Here, Olier was scared of all of the geese, Bailey instructed Olier how to defend herself from all of the geese, and Bailey attempted to distract all of the geese. Bailey arguably understood that *all* of her geese were potentially aggressive and acted accordingly. Therefore, a jury could find that what happened to Olier was foreseeable to Bailey.

¶37.    This concept perhaps was best expressed by the Supreme Court of South Dakota, which held that a plaintiff can establish foreseeability by arguing "to the jury that the owner knew or should have known of the dog's dangerous propensities or that, under the *totality of the circumstances*, injury to *the plaintiff* was reasonably foreseeable." *Rowland v. Log Cabin, Inc.*, 658 N.W.2d 76, 79 (¶ 9) (S.D. 2003) (emphasis added). That court went on to say that, while "the duty owed by a business owner to a business invitee and the duty owed by a dog owner to individuals in society have different origins, the reasonable person standard applies to both." *Id.* (¶ 11). As for Bailey, there remains a dispute of fact whether Olier's injury was reasonably foreseeable under the totality of the circumstances. Similarly,

18

it may be foreseeable to a landowner that visitors may come unannounced to that landowner's property, or that errant children or others may inadvertently or negligently stray onto their property. Under the totality of the circumstances, if the injury by an animal is reasonably foreseeable, the animal's owner may be held liable.

¶38. However, Justice Dickinson's dire predictions of successful suits against homeowners by burglars are defeated by the longstanding rule in this state that "[o]ne has a right to defend his home and the members of his family . . . and protect his property from intruders and trespassers." *Anderson v. Jenkins*, 220 Miss. 145, 150, 70 So. 2d 535, 538 (1954). The Restatement (Second) of Torts states that "[a] possessor of land or chattels is privileged to employ a dog or other animal, for the purpose of protecting his possession of land or chattels from intrusion. . . ." *Restatement (Second) of Torts* § 516 (1977). Landowners in this State are permitted to use lethal force to resist attempts "to commit any felony . . . upon or in any dwelling . . . or in the immediate premises thereof in which such a person shall be. . . ." Miss. Code Ann. § 97-3-15(1)(e) (Rev. 2014). Clearly, no liability can attach when a malicious trespasser is attempting to harm the person, family, or property of the owner.

¶39. Justice Coleman's dissent takes issue with our expansion of the dangerous-propensity doctrine to an animal which had not exhibited a dangerous propensity in the past. Indeed, here, no evidence was adduced that the goose in question ever before had bitten anyone. A different, older goose had, at a time previous, chased a police officer out of the yard. So, under a strict reading of *Poy*, Olier's suit cannot be maintained. However, the entire purpose of the dangerous-propensity rule is to hold owners liable for the actions of their animals where the owners reasonably could foresee the injury complained of, or where they should

19

have known that any or all of their animals were likely to exhibit behavior that could lead to an injury. The fact that the particular goose in question had not exhibited a dangerous propensity before does not necessarily matter when Bailey may have known that her geese were aggressive and possibly dangerous *in general*. When a person keeps a large group of essentially indistinguishable animals, some of which have exhibited dangerous propensities in the past, we find that such person can be liable for injuries attributable to characteristics that the animals have exhibited collectively. Here, Bailey's geese were known to have chased a visitor without warning, and this Bailey clearly knew. Additionally, as stated above, it is the group of geese collectively that concerned Olier and Bailey. Accordingly, although one goose actually bit Olier and caused her to fall, the analysis of that particular individual goose's history is unnecessary.

¶40.    The Dickinson dissent would send the plaintiff on a wild-goose chase to find and identify a single offending fowl and determine its particular history of dangerous propensity. As has been said before, "[i]t is common knowledge that horses buck, cattle roam, cats stray and dogs bite." ***Blaha v. Stuard***, 640 N.W.2d 85, 88 (¶ 9) (S.D. 2002). If that be the case, it also is common knowledge that geese honk, hiss, chase, and bite.

¶41.    The Dickinson dissent seems to recognize this point, as it remarks that the plaintiff failed to produce evidence that showed that the goose in question did not exhibit a propensity that was not natural to geese as a class of animal. This contention belies an understanding of the purpose of the dangerous-propensity rule. The rule is necessary to impose liability on animal owners who, without the occurrence of a prior incident involving an outside party, would not have actual or constructive knowledge of any dangerous

propensity of their otherwise tame and predictable animal. If the animal in question belongs to a class that exhibits a dangerous propensity that is natural to its class, the need for the propensity rule falls away because the natural propensity of the animal is known or should be known to its owner. *See Poy*, 273 So. 2d at 494 ("A distinction has been made between animals which, by reason of their species, are by nature ferocious, mischievous or intractable, and those of a species normally harmless. . . . In the second class are cattle, sheep, horses, dogs and cats. . . ." (quoting W. Prosser, *Handbook of the Law of Torts* § 75 (3rd ed. 1964)).

¶42.    Where, as here, the goose is just being a goose, and being a goose includes biting and chasing people, then there needs to have been no prior incident to put its owner on notice of that propensity, as the owner knew or should have known that its animal naturally engaged in that kind of behavior. *See Williams v. Tysinger*, 399 S.E.2d 108, 111 (N.C. 1991) (holding defendants liable because they were "chargeable with knowledge of the general propensities" of a horse, which "include the fact that the horse might kick without warning or might inadvertently step on a person.").

¶43.    Finally, the Coleman dissent argues that Olier has not demonstrated that Bailey had superior knowledge of her geese's dangerous propensity, and that both were fully aware of the propensity of the geese. With respect, that is an issue for the jury. Olier claimed that Bailey held herself out as a goose expert. Bailey tutored Olier in how to defend herself from geese and assured her that she would be safe in the yard. Olier admittedly was hesitant to enter the yard again, but did so with faith in Bailey's confident assurances. If this case is tried, the jury will be free to distribute fault as it sees fit. If it finds that no reasonable person

21

would have reentered the yard, then it will not find for Olier. Several questions are left unanswered regarding the relative fault of the two parties, but those are not for our decision. Only a trial can settle those questions.

¶44.    In that context, we find that, viewing the facts in the light most favorable to the plaintiff, there exists an issue of fact regarding whether Bailey was on notice of her geese's dangerous propensity. Although Bailey had locked up the adult geese, including the only one that specifically could be identified as having chased a person in a previous incident, she was on notice of her younger goslings' aggressive proclivities. She witnessed Olier's going into the yard and quickly retreating from the squawking, hissing, approaching geese. Bailey then went out into the yard to distract the geese, clearly with the knowledge that if she did not do so, the geese would aggressively approach Olier again. Furthermore, she gave Olier a long bamboo stick with which to fend off the geese *and instructed her in its use*, plainly indicating that she knew that the geese probably would approach Olier and that Olier may have need of the stick for purposes of defense. We find that there is at least a question of fact regarding whether Bailey was on notice of her geese's dangerous propensity. She had witnessed the geese being aggressive toward Olier, she armed Olier, she trained Olier to defend herself from the creatures, and she volunteered to act as a diversionary decoy so the geese would not immediately set upon Olier when she entered the yard. A reasonable and properly instructed jury could find that the type of injury caused by these geese reasonably could have been foreseen by Bailey under these circumstances.

¶45.    While our holding today may seem to be either a departure from or an expansion of our longstanding dangerous-propensity rule, the situation before us simply is not conducive

22

to that test because it heretofore has been restricted to a single animal. The dogs in *Poy* and *Mongeon* were individual animals, or a pair of animals. Here, Olier was not fearful of one particular animal, or a pair, but an entire group. That is why Bailey may be held liable for her geese's behavior without determining whether the particular goose that attacked Olier had exhibited a dangerous propensity in the past. Whether a pack of dogs, a herd of rodeo cattle, a swarm of honey bees, or a gaggle of geese—when analyzing the behavior of any grouping of nonhuman creatures with a dangerous propensity *collectively*, it is unnecessary and counterintuitive to analyze the individualized history of each and every creature in the unit. This has been a truth accepted by mankind since we drew on cave walls. We fear not the wolf, but the pack; not the bee, but the swarm; not the buffalo, but the herd. Janet Olier feared not the goose, but the gaggle. The bamboo stick was provided for her defense against *all* of the geese, not just one. Bailey attempted to distract *all* of the geese, not just one. A jury could find that, under the totality of the circumstances, this incident could have been foreseeable to Bailey, and therefore summary judgment was inappropriate.

**CONCLUSION**

¶46. The trial court properly granted summary judgment to Donna Bailey on the theory of premises liability. Janet Olier was a licensee as a matter of law, and Donna Bailey did not willfully or wantonly injure her. However, there remains a question of fact regarding whether Donna Bailey was on notice of the dangerous propensity of her geese, and whether Janet Olier's injury was reasonably foreseeable under the totality of the circumstances. Accordingly, there is a genuine issue of material fact regarding whether Donna Bailey breached her duty of care to Janet Olier as an animal owner. We reverse the grant of

23

summary judgment on that basis and remand this case to the County Court of Jackson County for further proceedings consistent with this opinion.

¶47.    **AFFIRMED IN PART; REVERSED IN PART AND REMANDED.**

**WALLER, C.J., CHANDLER AND KING, JJ., CONCUR. LAMAR, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. RANDOLPH, P.J., CONCURS IN PARTS I AND II AND DISSENTS IN PART III WITHOUT SEPARATE WRITTEN OPINION.  DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PIERCE, J.; RANDOLPH, P.J., JOINS IN PART II ONLY.**

**DICKINSON, PRESIDING JUSTICE, DISSENTING:**

¶48.    The majority—as a matter of first impression in Mississippi—finds that civil claims resulting from injuries caused by animals on a homeowner's property may not be analyzed under premises-liability law.   The majority abandons the trespasser and licensee classifications for purposes of determining the homeowner's duty of care, leaving homeowners wide open to claims of ordinary negligence by trespassers who come on their property—unwelcome and uninvited.  Because I believe this to be unwise, I respectfully dissent.

¶49.    The traditional rule in Mississippi has been that an invited social guest provides no benefit to the landowner, and therefore is a mere licensee.  And landowners owe no more to licensees than a duty to refrain from willfully or wantonly injuring invited social guests.[10] Many courts have abolished the old common-law distinction between licensees and invitees

---

[10] *Wright v. Caffey*, 239 Miss. 470, 475, 123 So. 2d 841, 843 (1960).

altogether.[11]  I believe this goes too far.  But other courts have settled on a middle-ground approach and have held that social guests who have been invited to the property should be treated as invitees entitled to a duty of reasonable care.[12]  I believe it is time for this Court to follow the lead of these courts.  We should abandon the licensee classification for persons who are invited to come on the property (social guests), regardless of the reason for the invitation, and reclassify them as invitees.  In my view, an express invitation carries with it an implied representation that the property is reasonably safe for the guest's visit.  Thus, it seems to me this sensible change would be reasonable and in concert with today's social mores.

¶50.    The majority rejects this view and chooses to leave homeowners open to claims of negligence by everyone, including trespassers.  This requires that I apply the law that I firmly believe controls this case—premises-liability law.  In this negligence case, Olier charges that, by maintaining geese with dangerous propensities on her property, Bailey did not maintain her premises in a reasonably safe condition.  Her allegations of negligence concerning the geese in the yard are no different from allegations of negligence concerning spills on the floor, cracks in the sidewalk, improperly stacked shelves in a store, or exposed electrical wiring.  All such negligence claims associated with maintaining dangerous conditions on the

---

[11] *See, e.g.*, **Rowland v. Christian**, 443 P.2d 561, 568 (Cal. 1968) (abolishing the common-law distinctions between trespassers, licensees, and invitees), *superseded in part by statute*, Cal. Civ. Code § 847 (West 2014) ("Immunity from liability; injuries or death occurring on property during or after the commission of certain felonies").

[12] *See, e.g.*, **Burrell v. Meads**, 569 N.E.2d 637, 643 (Ind. 1991) (holding that social guests are invitees entitled to a duty of reasonable care).

property first must be filtered through the premises-liability classifications for determination of the degree of negligence necessary for liability.

¶51. When a person enters onto another's land and suffers personal injuries due to the landowner's negligence for failure to keep the premises in a reasonably safe condition—for instance, failing to repair a faulty electrical appliance or keeping a flock of attack geese—the claim must be analyzed under premises-liability law.

¶52. A premises owner's liability is predicated upon the decision to create, maintain, or allow a dangerous condition on the property.[13] The majority incorrectly concludes—for the first time and with no citation of authority—that premises-liability cases must be limited to negligence associated with "stationary conditions of the property," and that these stationary conditions must "remain in place unless moved or changed by the landowner." This bold, unsupported characterization of premises-liability law is breathtaking in its scope.

¶53. While the majority's label may apply to dangerous spills that fall on the floor or dangerously stacked boxes that fall on a customer, it certainly does not explain why, in *Cade v. Beard*, this Court used premises-liability law to analyze a hunter's death in an ATV accident.[14] Nor does it explain *Albert v. Scott's Truck Plaza*, in which this Court relied on premises-liability law to analyze the landowner's liability for a pedestrian being struck by

---

[13] *See **Mayfield v. The Hairbender***, 903 So. 2d 733, 737 (Miss. 2005) (citing ***Tharp v. Bunge, Corp.***, 641 So. 2d 20, 25 (Miss. 1994)) ("***Tharp's*** authority extends to cases (including the case before us today) in which the plaintiff alleges the defendant was negligent in creating or failing to repair a dangerous condition, and the defendant alleges the dangerous condition was open and obvious.").

[14] ***Cade v. Beard***, 130 So. 3d 77, 81 (Miss. 2014).

a big truck.[15] Nor does it explain the numerous cases in which we have used premises-liability law to analyze a premises owner's liability for injuries caused to its invitees by other persons.[16]

¶54.    In attempting to distinguish the above cases, the majority states that "premises liability was the only avenue through which the premises owner could have been brought into the litigation." This concession agrees with my only point in citing these cases, and that is to refute the majority's assertion that premises-liability cases must be limited to negligence associated with "stationary conditions of the property," and that these stationary conditions must "remain in place unless moved or changed by the landowner."

¶55.    Simply stated, I believe uninvited licensees and trespassers who go onto another's property should not be allowed to make an ordinary negligence claim and recover for attacks by a homeowner's animal—whether a dog, cat, or goose. This unwise approach exposes homeowners to liability, even for guard dogs kept inside the house. While I would reclassify invited social guests as invitees owed a duty of reasonable care, a majority of this Court has not adopted that view and I am constrained to analyze this case under our existing premises-liability law. Because Olier is a licensee under our existing law and because Bailey's

---

[15] ***Albert v. Scott's Truck Plaza, Inc.***, 978 So. 2d 1264, 1266 (Miss. 2008).

[16] *See* ***Kroger Co. v. Knox***, 98 So. 3d 441, 442 (Miss. 2012) (premises-liability action involving purse-snatching at grocery store); ***Double Quick, Inc. v. Moore***, 73 So. 3d 1162, 1164 (Miss. 2011) (premises-liability action involving shooting in convenience-store parking lot); ***Doe v. Jameson Inn, Inc.***, 56 So. 3d 549, 551 (Miss. 2011) (premises-liability action involving sexual assault at hotel); ***Thomas v. Columbia Grp., LLC***, 969 So. 2d 849, 851 (Miss. 2007) (premises-liability action involving shooting at apartment).

conduct cannot rise to the level of willful and wanton negligence, summary judgment was proper. For these reasons, I respectfully dissent.

**COLEMAN, JUSTICE, DISSENTING:**

¶56. I agree with Presiding Justice Dickinson that the instant case is a premises liability case and that the law will not allow us to consider the applicability of the dog-bite rule, or dangerous propensity rule as it is otherwise called, without considering our law on premises liability. However, rather than changing our longstanding premises liability law and classifications of plaintiffs attendant thereto, I believe Mississippi law as it stands provides that the usual standard for negligence against a licensee, as all agree the plaintiff was in the instant case, does not apply to the plaintiff here. I would apply the exception to the invitee/licensee dichotomy created by the Court in *Hoffman v. Planters Gin Co., Inc.*, 358 So. 2d 1008 (Miss. 1978), and apply an ordinary and reasonable standard of care to the defendant.

¶57. However, even under such a standard of care, for three reasons the plaintiff has failed to adduce sufficient evidence, even taking all evidence in the record in a light favorable to her, to create an issue of material fact. What I will herein refer to as the dangerous propensity rule governs the defendant's claim under the reasonable care standard, and the plaintiff has failed to create an issue for the jury under it. First, the plaintiff failed to produce any evidence that the goose that attacked her had ever displayed a propensity for dangerous behavior prior to her injury. Second, the plaintiff failed to produce any evidence that the aggressive behavior of the goose was anything other than natural behavior for geese as a class of animals. Finally, I would hold that because the plaintiff's knowledge of the relevant

28

behavior of the defendant's geese equaled that of the defendant, the defendant cannot be liable. Accordingly, I am of the opinion that as a matter of law the defendant cannot be held liable for the plaintiff's injuries.

## I. The case *sub judice* must be analyzed as a premises liability case, but a reasonable standard of care nevertheless applies to the defendant.

¶58. When a plaintiff receives injuries as a result of the conditions present or activities conducted on premises belonging to the defendant, premises liability law applies. ***Double Quick, Inc. v. Moore***, 73 So. 3d 1162, 1166 (¶ 10) (holding that premises liability law controlled claim arising from a parking lot shooting when decedent did not die as a result of acts by defendant's employees and when defendant's employees were unaware of his presence on the property; rather, the death occurred because of activity being conducted on the property); ***Doe v. Jameson Inn, Inc.***, 56 So. 3d 549, 553 (¶ 11) (Miss. 2011). The ***Double Quick*** Court wrote, "Because [the decedent's] injury was the result of an activity that occurred on Double Quick's property, we find that Moore's claim is one of premises liability. Accordingly, the trial court erred in holding that the instant case was not a premises-liability case." ***Double Quick***, 73 So. 3d at 1166 (¶ 10). In other words, a negligence claim sounds in premises liability or it does not. It cannot sound in both. Keeping geese is an activity, and in the instant case the defendant conducted the activity on her premises where the injury occurred. The instant case is one that sounds in premises liability and is subject to premises liability law.

¶59. All parties agree that the plaintiff entered upon the defendant's property as a social guest and licensee, and I have nothing to add to the majority's explication of the standard of

29

care normally owed a licensee. However, the normal standard of care does not apply to the plaintiff in the instant case. In ***Hoffman v. Planters Gin Co., Inc.***, 358 So. 2d 1008 (Miss. 1978), the fourteen-year-old plaintiff was injured when he accompanied his father to a cotton gin for the purpose of transporting cottonseed and fell into a moving auger. *Id.* at 1010. He lost his leg below the knee. *Id.* There were no warning signs on the building or doors, and the entrance to the tunnel containing the auger was never locked; testimony established that the generally accepted safety practices in the Mississippi Delta included posting warning signs, preventing unauthorized persons around machinery, and covering augers accessible to anyone. *Id.* The plaintiff testified that half of the auger covers were off and no gin employees or supervisors ever warned him to stay away from the augers despite knowing he often was around them. *Id.* He was, however, warned that the augers were dangerous. *Id.* After establishing that, as either the child of an adult who himself was on the premises to conduct business or, in the alternative, as an invitee who exceeded the scope of his invitation, the plaintiff was a licensee, the ***Hoffman*** Court eschewed the traditional standard of care owed to a licensee in favor of the usual negligence standard of reasonable care. *Id.* at 2012. The Court wrote,

> The legal distinctions between a licensee and invitee have little significance once the presence of a person upon the possessor's premises is known and there are affirmative actions involving him. Status relates largely to negligence for the condition of premises, that is, passive negligence and not to active or affirmative negligence emanating from action or inaction by the possessor with knowledge of an individual's presence.

*Id.* In closing and after discussing several other secondary sources, the ***Hoffman*** Court closed by quoting with approval Prosser, *Law of Torts* 379 (4th ed. 1971), which read, "It is

30

now generally held that as to any active operations which the occupier carries on, there is an obligation to exercise reasonable care for the protection of a licensee. . . ."

¶60.   There have been limited opportunities for the Court to address what has come to be known as the *Hoffman* exception in the more than three-and-a-half decades of its existence. However, I would be remiss if I failed to address one aspect of its development that runs counter to my position.  In the opinion, the *Hoffman* Court wrote:

> We think the premises owner is liable for injury proximately caused by his affirmative or active negligence in the operation or control *of a business* which subjects either licensee or invitee to unusual danger, or increases the hazard to him, when his presence is known and that the standard of ordinary and reasonable care has application.

*Hoffman*, 358 So. 2d at 1013 (emphasis added).  Nowhere else in the opinion does the Court use the word "business" in the same context, and none of the secondary sources limits the principle that I now refer to as the *Hoffman* exception to businesses.  *Id.* at 1013.

¶61.   In the context of the opinion as a whole, the *Hoffman* Court's use of the clause, "affirmative or active negligence in the operation or control of a business," did nothing more than describe the conduct at issue in the case.  I do not read it to express an intent on the part of the Court to limit the exception to business invitees, nor am I able to appreciate any difference between business premises and nonbusiness premises that would explain such a limitation.  However, I acknowledge that subsequent opinions read the language as a limit of the exception to business premises, *see,* e.g., *Little v. Bell*, 719 So. 2d 757, 761-762 (¶ 22) (Miss. 1998) ("[T]he Hoffman exception only applies to those cases involving the *operation or control of a business*.") (citing *Hughes v. Star Homes, Inc.*, 379 So. 2d 301, 304 (Miss. 1980)), and that to adopt my position, the Court would have to clarify the rule and modify,

31

if not overrule, cases such as ***Little*** and ***Hughes***.  It is remarkable that, although the ***Little***

Court relied on ***Hughes*** to support its reading of the business-premises limitation into

***Hoffman***, ***Hughes*** itself does not do so.  In fact, the word "business" appears nowhere in the

***Hughes*** opinion.  Rather, the  ***Hughes*** Court expressed the narrowness of the ***Hoffman***

exception as follows:

> In one case, ***Hoffman v. Planters Gin Co., Inc.***, 358 So. 2d 1008 (Miss. 1978),
> we applied the standard of ordinary and reasonable care rather than the
> standard of intentional or wanton negligence due a licensee.  In that case we
> held that the owner of premises is liable for injury proximately caused by the
> owner's affirmative or active negligence in the operation or control of
> activities which subjects a licensee to unusual danger or increases the hazard
> to the licensee when the presence of the licensee is known.  In ***Hoffman***, we
> changed the standard of care owing to a licensee but carefully limited the new
> standard of care to those cases involving injury resulting from active conduct
> as distinguished from conditions of the premises, or passive negligence.

***Hughes***, 379 So. 2d at 304.

¶62.    Because the remainder of the ***Hoffman*** opinion cannot be read to support the

business-premises limitation; the Court expressly stated its "view" to be that statement of the

rule written by Prosser, quoted above, which makes no mention of such a limitation; and the

***Hughes*** opinion does not support the ***Little*** Court's reliance upon it, I am of the opinion that

it would be correct for the Court to clarify that the ***Hoffman*** exception does not apply only

to business premises.

¶63.    Turning to the case *sub judice*, the evidence clearly shows that the defendant knew

the plaintiff was present on the premises.  Moreover, an allegation of negligence relying on

the dangerous propensity rule is an allegation of active, rather than passive negligence.  As

I develop further below, a claim under the dangerous propensity rule is at its heart a claim

based on the superior knowledge of the animal owner and failure of the animal owner to warn or protect others from a dangerous propensity in the animal that, because the class of animal to which it belongs does not share the propensity, the other person cannot be expected to know of it. If the **Hoffman** Court considered the failure to lock doors, place warning signs, and cover the augers to be active negligence, so too is a dangerous-propensity claim. Moreover, a dangerous-propensity claim, as it is based on the superior knowledge of the defendant, is similar in nature to a failure-to-warn claim. Failure to warn constitutes active negligence. **Long Term Care, Inc. v. Jesco, Inc.**, 560 So. 2d 717, 719 (Miss. 1990) (failure to warn classified as active negligence in context of contribution between tortfeasors). Finally, by keeping the geese and encouraging her guest to make her ill-fated foray into their midst, the defendant increased the hazard. Accordingly, the **Hoffman** exception should apply here.

### II. The plaintiff has failed to create a triable issue of fact under the dangerous propensity rule.

¶64. Having set forth why I believe an ordinary care standard should apply, I now turn to what the standard is in a case involving allegations that an owner is liable for injuries caused by an animal. In **Poy v. Grayson**, 273 So. 2d 491 (Miss. 1973), the Court examined a few secondary sources addressing animal-owner liability and settled upon the following rule:

> There is a considerable diversity among the Courts of the several states as to the conditions under which liability may be imposed in cases of this kind. However, we believe the sounder rule requires that there be some proof that the animal has exhibited some dangerous propensity or disposition prior to the attack complained of, and, moreover, it must be shown that the owner knew or reasonably should have known of this propensity or disposition and reasonably should have foreseen that the animal was likely to attack someone.

33

*Id.* at 494. Regarding the dog attack in *Poy*, which the Court held resulted in no liability attributable to the owner, the Court wrote, "There is nothing whatever in the record capable of supporting a finding that this puppy had *previously* exhibited any such character or disposition as would reasonably have put Poy on notice or enabled Poy reasonably to foresee that it might attack or bite someone." *Id.* at 493-494.

¶65.    In *Mongeon v. A & V Enter., Inc.*, 733 So. 2d 170 (Miss. 1997), the Mississippi Supreme Court reversed a trial court's grant of judgment notwithstanding the verdict in a case where a jury awarded damages to a plaintiff who had been attacked by dogs belonging to the defendant. The *Mongeon* Court held that evidence of one occasion when the dogs earlier had growled at another person and a second occasion when the dogs had approached her small dog together sufficed to show a dangerous propensity or disposition. *Id.* at 172 (¶ 12).

¶66.    By contrast, in the case *sub judice*, neither the majority nor the plaintiff identifies any evidence of record that showed any sort of dangerous propensity or disposition on the part of the young goose prior to the incident which resulted in the attack on the plaintiff. At best, the plaintiff points to aggressive behavior of the goose during the attack itself but identifies nothing that occurred beforehand that could fairly be said to put the defendant on notice that the goose was dangerous or had any tendency to injure persons. Both the *Poy* and *Mongeon* Courts looked for evidence of dangerous behavior that proceeded the underlying attacks – not that occurred as part of the same series of events that included the attack as occurred in the instant case. *Poy*, 273 So. 2d at 491, 493 ("All of the other direct testimony was to the effect that the puppy had never attacked or attempted to attack anyone *prior to the occasion*

when plaintiff was bitten.") (emphasis added); *Mongeon*, 733 So. 2d at 172 (¶¶ 9-10, 12). With respect, I disagree with the majority's choice to rely on evidence that at some point another goose within the gaggle of geese acted aggressively toward some law enforcement officers. The dangerous propensity doctrine, as discussed in *Poy* and the secondary sources discussed therein, applies only to individual animals.

¶67. Second, the *Poy* Court, quoting 3 C.J.S. *Animals* 148a (1936), wrote that for liability to attach, the vicious propensity in question must be "not natural to the class of animals to which the offending animal belongs." *Poy*, 273 So. 2d at 494. The plaintiff failed to produce any evidence showing that the dangerous propensity exhibited by the subject goose in the instant case was not natural to geese as a class of animal. The lack of evidence on the point provides a fatal blow to the plaintiff's appeal. On the instant point, the majority responds with the suggestion that geese as a group are dangerous animals, and because they are dangerous as a class the dangerous propensity rule "falls away." (Maj. Op. at ¶41). However, as noted above, the dangerous propensity rule upon which the plaintiff relies applies by its terms only when the dangerous propensity in question *differentiates* the animal from other animals of the same class.

¶68. Finally, the plaintiff has failed to demonstrate that the defendant had superior knowledge of any dangerous propensity of the goose. In the case *sub judice*, all evidence of any danger posed by the goose, or gaggle of geese, was known equally to the plaintiff and defendant. The defendant entered the domain of the geese once alone and retreated. Armed with a bamboo stick, the plaintiff soldiered once more into the geese. Because the plaintiff's knowledge equaled that of the defendant, I would hold she cannot recover. *See **Durham v.***

35

*Mason*, 256 Ga. App. 467, 468, 568 S.E.2d 530, 532 (2002) ("The true test of liability is the owner's superior knowledge of his dog's temperament."). While I find no case in which Mississippi has explicitly adopted the superior knowledge requirement, I find cases discussing such a requirement to be persuasive. It follows naturally from two principles. First, liability of the owner arises from the knowledge of the dangerous propensity. "'The gist of the action has been characterized as the keeping of the animal *with knowledge of its vicious disposition*.'" *Poy*, 273 So. 2d at 493 (quoting 4 Am. Jur. 2d *Animals* § 86 (1962)) (emphasis added). Second, the dangerous propensity distinguishes the animal from its class of like animals. *Poy*, 273 So. 2d at 494. It follows that a dangerous propensity known to both parties either because it is natural to the class of animal or because both have witnessed the same evidence of the subject propensity cannot support a finding of liability. Accordingly, equal knowledge possessed by the plaintiff obviates the above-stated purpose for imposing liability.

¶69. I would hold that the defendant in the case *sub judice* was subject to the *Hoffman* exception and a reasonable care standard, that the standard of reasonable care applicable to the defendant is established by the dangerous propensity rule, and that, even taking the evidence of record in a light most favorable to the plaintiff, she has failed to make a *primae facie* case. Accordingly, summary judgment was appropriate, and I respectfully dissent.

**PIERCE, J., JOINS THIS OPINION. RANDOLPH, P.J., JOINS THIS OPINION IN PART II ONLY.**

36